UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

          vs.                        CRIMINAL NO. 3:19-CR-14 (JAM)

TONY TUAN PHAM                   November 8, 2021

## MEMORANDUM IN AID OF SENTENCING

*Why does everyone hate Tony Pham? He is a two-time fraudster. In 2010 he was sentenced to 36 months in prison. In prison, Tony participated in RDAP to get treatment and to get six months off his sentence. Tony then used it as a steppingstone for another scheme. It is not hard to see why everyone hates Tony Pham. Especially those who work in the very system he manipulated.*

\*\*\*

I.      **This History and Characteristics of Tony Tuan Pham**

*"Next. Next. Next." The word repeats rhythmically like a drum. "Next." He is getting closer. The line is particularly long today. He is so hungry. "Next." He stares at the waist of the man in front of him. He wonders how long he's been here. "Next." A man hands him a tray. Same as yesterday, a roll, a piece of chicken, and a small carton of milk. He looks out onto a sea of thousands of people fighting over what little food they are given. It is 1975 Guam.  Tuan Vu Pham is thousands of miles from his home – forcibly separated from his parents – in a refugee camp.*

\*\*\*

A.  <u>Tony witnessed violence and forced family separation during the Vietnam War.</u>

Tony Tuan Pham was born Tuan Vu Pham, in Can Tho, Vietnam, in November 1969, during the height of the Vietnam War. PSR ¶ 92. Can Tho is a province-level municipality in southern Vietnam, the largest city in the Mekong Delta, less than 100 miles from Ho Chi Minh

City, then known as Saigon. Tony's father, Tuyen Van Pham ("Peter"), was the deputy mayor of Can Tho. *See* Exh. A (Ltr. From Christy Lee) at 1; Exh. B (Ltr. from David Pham) at 3; Exh. C (Ltr. from Peter Pham) at 1); Exh. D (Ltr. from Cindy Ly) at 3. Peter lived in poverty in North Vietnam, fled the North as a child, and became a successful businessman and high-ranking government official in the South. *See* Exh. B (Ltr. from David Pham) at 3; Exh. C (Ltr. from Peter Pham) at 1; Exh. D (Ltr. from Cindy Ly) at 4. Tony's mother, Dung Thuy Vu ("Mary"), was a school-teacher and translator for the U.S. Embassy. Exh. D (Ltr. from Cindy Ly) at 3.

Tony experienced violence during the War. He "watched soldiers walking through the streets" and remembers "seeing dead bodies" and "hearing gunfire." Exh. R (Report of Robert M. Ortega, Ph.D., L.M.S.W. ("Ortega Report")) at 13. He remembers "being told to be afraid to be outside" and that he "had to always be on alert." *Id.* He and his siblings were told how and when to hide, and that there was a specific place to hide in the house; "they all knew what to do when they heard gunfire." *Id.* Tony and neighborhood children made a "game" of "looking for bullet holes in houses." *Id.* Tony's brother David remembers "seeing soldiers and tanks in front of the house at night," and "hearing loud explosions and seeing fires." Exh. B (Ltr. from David Pham) at 1. Sister Cindy recalls "gun shots and explosions everywhere," "soldiers in uniforms carrying shotguns, running, and getting on and off military trucks." Exh. D (Ltr. from Cindy Ly) at 1.

In April 1975, when Tony was five years old, the People's Army of Vietnam and the Viet



Tony (baby) pictured with family circa 1970 in Vietnam.

Cong captured Saigon, ending the War and beginning formal reunification of Vietnam into the Socialist Republic of Vietnam. For Peter, an official in the Republic of Vietnam and an American collaborationist, the regime's collapse meant that he and his family were

at risk of imprisonment or execution. *See* Exh. B (Ltr. from David Pham) at 1, 3; Exh. A (Ltr. from Christy Lee) at 1–2; Exh. C (Ltr. from Peter Pham) at 1. Peter fled Vietnam alone on a Church-sponsored shipping boat, leaving his wife and five children under enemy occupation. *See* Exh. C (Ltr. from Peter Pham) at 1. Peter abandoned the family without telling anyone. *See* Exh. D (Ltr. from Cindy Ly) at 1 ("After the South lost the Vietnam war to the North my dad went to work one day and never came back; he had evacuated to the US. I, my mom, and my two youngest siblings, Peter and Christy, got stuck behind."); *id.* at 2 ("my dad, a government official, left Vietnam with his co-workers by sea without saying a word to my mom"); Exh. A (Ltr. from Christy Lee) at 2 (father "had to flee Vietnam as soon as possible leaving my mom and 3 kids behind").



Vietnamese Refugee camp in Pensacola showing tent-like living conditions where Tony was housed at 6 years old in 1975. He lived here after transferring from a refugee camp in Guam.

Compared to other Twentieth Century wars, Vietnam War witnessed a sharp increase in civilian casualties — and this included violence caused to or witnessed by children. The war produced a striking number of refugees, many of whom were also children who had already witnessed immense trauma and bloodshed. Moreover, Vietnam's healthcare infrastructure at the time was poor and there was a severe undersupply of medical care available. This "took a direct toll on the civilian population."[1] As "the most vulnerable members of society," children like Tony are especially susceptible to the horrific impacts of war such as physical injury and the loss of

---

[1] Goldson, "The Effect of War on Children."

critical social resources, such as adequate healthcare and quality public education.[2]

      B.  <u>At age five, Tony was forced to separate from his parents to flee Vietnam.</u>

Mary's brother-in-law, Vinh Nguyen, was a fighter pilot for the Republic of Vietnam Air Force and had supported American troops. *See* Exh. B (Ltr. from David Pham) at 1; Exh. D (Ltr. from Cindy Ly) at 1. Vinh was granted the opportunity to escape Vietnam on an American cargo plane. *Id.* Vinh and his wife, Khanh, had no children of their own, and had planned to bring Mary's three eldest children with them into exile: 9-year-old Cindy, 8-year-old David, and 5-year-old Tony. *See* Doc. Exh. B (Ltr. from David Pham) at 1. Cindy refused to leave with Vinh; she begged to remain in Vietnam with her mother and younger siblings. *Id.* ██████████████████

████████████████████████████████████

████████████████████ *See* Ortega Report at 4; Exh. D (Ltr. from Cindy Ly) at 6–7. Still, five-year old Tony and David were forced to separate from their parents.  Extremely stressful experiences, including family separation, can disrupt a child's brain architecture and cause irreversible damage to lifelong development.  For young children, like Tony, trauma and other forms of "toxic stress" can have lifelong negative impacts and tangibly influence their adult life: children with such adverse experiences "have higher chances of adopting health risk behaviors in the future." Family separation in the context of immigration can be especially harrowing for children and can put them at higher "risk of mental health issues."[3]  Tony and David fled to a refugee camp in Guam, where they remained for several months before relocating to a camp in Florida. *See* Exh. B (Letter from David Pham) at 2; Exh. C (Ltr. from Peter Pham) at 2. Tony experienced extreme poverty and food scarcity in the refugee camps. Ortega Report at 13.

<p align="center">***</p>

---

[2] *Id.*
[3]  Simha, "The Impact of Family Separation on Immigrant and Refugee Families."

*"Drink another one Tony!" "Dance Tony!" "Pretend you are a lion!" All the men laugh! Tony is*

*so funny. At six years old, he is the funniest of his siblings. His uncle gives him another beer. His*

*uncle's friends clap with amusement. "Drink up!" Tony complies. His vision is getting fuzzy. He*

*stumbles. He's getting dizzy. When he wakes up, he is naked. Only a sheet covers his body. A man*

*lays next to him. He turns Tony over onto his belly and gets on top of him.*

<div align="center">***</div>

C.  Tony suffered physical, emotional, sexual and psychological abuse.

Vinh and Khanh physically, verbally, and emotionally abused Tony and David. PSR ¶ 93.

The Nguyens doled out beatings for discipline. *Id.* When Tony wet the bed,[4] his aunt and uncle

forced him to stand naked in a cold shower for several minutes, and then made him stand cold and

wet until he dried off. *Id;* Exh. B (Ltr. from David Pham) at 2. The Nguyens kept food under lock

and key, and withheld food as punishment. PSR ¶ 93. David recalled, "The refrigerator and pantry

were locked, and we only ate what was given to us. I remembered always being hungry after

meals." Exh. B (Ltr. from David Pham) at 3; Exh. C (Ltr. from Peter Pham) at 6. Tony recalled,

"If we were bad, we weren't allowed to eat. It was a privilege to get an orange." PSR ¶ 93.

i.  Tony's early experiences with food deprivation has impacted his adult life.

Mr. Pham carries the early memories of the scarcity of food to this day. Tony's son

Christian relates that to this day, Tony finds it so difficult to throw food away. When the family

goes out to eat, Tony does not order for himself, and instead eats their leftovers. Exh. E (Ltr. from

Christian Pham) at 1. David, who also suffered life with the Nguyens, relates that food deprivation

---

[4] In fact, Tony's bed-wetting was likely a sign of the trauma he suffered.  There is an association between bed-wetting and developmental milestones in childhood. Particularly, bed-wetting can be indicative of a possible delay in the development of the central nervous system consistent with trauma.  Touchette et al., "Bed-Wetting and Its Association With Developmental Milestones in Early Childhood."  Bed-wetting can also be exhibited simultaneously with other symptoms of trauma such as anxiety, depression, and dissociative episodes.  Reyes and Lieberman, "Child–Parent Psychotherapy and Traumatic Exposure to Violence."

"was traumatic and still impacts [his] behavior towards food to this day." Exh. B (Ltr. from David Pham) at 2. David overbuys at grocery stores and restaurants. *Id.*

      ii.    <u>Tony suffered more physical and sexual abuse than his siblings because he was targeted.</u>

Young Tony was social, funny, and theatrical; he loved to sing and dance. Accordingly, his uncle targeted him to forcibly drink beer, as a form of entertainment to his uncle and his adult friends. *Id*; *see also* Ortega Report at 14. David recalled, "[t]he adults would laugh because of how Tony acted after he had been given alcohol. . . Tony is more outgoing. He was the fun or 'cuter' child and made people laugh." Exh. B (Ltr. from David Pham) at 2; PSR ¶ 93.   Tony's first exposure to forced alcohol consumption was also linked to sexual abuse. Tony would be plied with beer "to the point that he would be incoherent and then become sexually abused." Ortega Report at 14. *See* PSR ¶ 94. Tony does not recall exactly who his abuser was, and for years recalled that the abuse was at the hands of his uncle's nephew, who was also present with them at the refugee camps. ███████████████████████████████████████████████████ ██████████████████████████████, Tony has come to realize that their uncle was also his abuser. *Id.*; *see* Ortega Report at 14, 19; Exh.  D.  Years later, Vinh sexually abused foster children in his care. *See* Exh. B (Ltr. from David Pham) at 2–3; Exh. A (Ltr. from Christy Lee) at 7; Exh. D (Ltr. from Cindy Ly) at 7.

Tony was fondled once or twice weekly for approximately 6–8 months while living at the refugee camp in Florida. Ortega Report at 19. Sometimes Tony was alone with his abuser, and other times Tony "remembers multiple men being there, laughing at him." *Id.* Tony recalled that "alcohol was always involved" and that "it was part of the ritual for him to be either given beer to drink or else it was poured and brought to his mouth." Ortega Report at 20. Tony, separated from his father, "said the abuser developed a fatherly kind of relationship with him, and he knew he

really wanted that relationship." Ortega Report at 21.

### iii.    Tony's sexual abuse groomed him to "people please."

After the abuse, Tony was told "that he was loved, would be taken care of, was valued, and was a good boy." *Id.* According to Dr. Ortega's report, Tony "knew he had to do his job because the person's big hand would expect him to be there." *Id.* at 21. The social science literature on refugee children separated from their parents confirms that children may substitute care that they need from adults (from which they may be separated from) with someone who cares about them "only slightly." This unhealthy substitution may establish trust and intimacy issues down the line. "Children who are displaced or moved around to various refugee camps may lose the opportunity to receive traditional education, social life, and may experience sexual abuse—never "attain[ing] the potential they had before the impact of war."[5]

While Tony and David suffered in their uncle's care, Mary was trapped in Vietnam with 9-year-old Cindy, 3-year-old Peter and 1-year-old Christy. Mary "blamed" her husband, a "coward," for "leaving her behind." Exh. D (Ltr. from Cindy Ly) at 2. Mary and the children tried to escape Vietnam numerous times, and on several occasions were caught and held in prison camps. *See* Exh. A (Ltr. From Christy Lee at 2); Exh. C (Letter from Peter Pham) at 1, 2. Mary "pretend[ed] to be mentally insane in front of the guards by acting belligerent and even attempted to take their guns. She would scream uncontrollably and act like she didn't even recognize her own children." Exh. A (Ltr. from Christy Lee) at 2; *see also* Exh. D (Ltr. from Cindy Ly) at 3.

Approximately one year after the fall of Saigon, Mary learned that Peter had made it to the United States. This imbued Mary with a renewed determination to escape Vietnam and reunite the family. Peter sent money from America to Mary. She used it to bribe fishermen to flee the country.

---

[5] Santa Barbara, Joanna. "Impact of War on Children and Imperative to End War." *Croatian Medical Journal* 47, no. 6 (December 2006): 891–94

*See* Exh. C (Letter from Peter Pham) at 1. On several occasions, scammers stole the money without providing help. Finally, after two years of trying to escape, one fisherman allowed the family to hide in the bottom of his boat – that is ultimately how they escaped the country. *See* Exh. A (Ltr. from Christy Pham) at 2; Exh. C (Ltr. from Peter Pham) at 1; Exh. D (Ltr. from Cindy Ly) at 3. Their boat had been at sea for days and was at risk of sinking when they were spotted by a Russian ocean liner ship, whose captain Mary convinced (the only English-speaker) to take them to the Philippines, where Mary and her children spent several months at a refugee camp. Exh. A (Ltr. from Christy Lee) at 2–3; Exh. C (Ltr. from Peter Pham) at 1–2; Exh. D (Ltr from Cindy Ly) at 3.

D. <u>The Pham family reunited in Michigan in 1977, but Tony still experienced abuse.</u>

On October 29, 1977, the Pham family was reunited in Grand Rapids. Exh. F (Oct. 29, 1977 Grand Rapids Press article, photo below, full article attached as exhibit); Exh. B (Letter from David Pham) 3; Ex. A (Ltr. from Christy Lee) at 3. Tony, now almost 8 years old, had not seen his parents for the last 2 ½ years. Tony's parents, until recently successful political and business figures in South Vietnam, faced racism, discrimination, and an insurmountable language barrier.



They obtained employment as factory workers. PSR ¶ 92.

Tony and his family featured in the Grand Rapids Press

Despite smiling faces for the newspapers, Tony's parents, Peter and Mary, did not have a happy marriage. PSR ¶ 95. They fought often and were both physically and verbally abuse to each other. *Id.*; Exh. B (Ltr. from David Pham) at 3; Exh. A (Ltr. from Christy Lee at 3–6). Tony's siblings all independently recalled that their mother chased their father around the house with a

knife. PSR ¶ 95; *see also* Exh. B (Ltr. from David Pham) at 4; Exh. A (Ltr. from Christy Lee) at 6; Exh. C (Ltr. from Peter Pham) at 2; Exh. D (Ltr. from Cindy Ly) at 4. Their father threatened to burn the house down. PSR ¶ 95.  Tony's parents physically and verbally abused him and his siblings. *Id.*; Exh. D (Ltr. from David Pham) at 3; Ex. A (Ltr. from Christy Lee) at 3. "All of us in one way or another suffered verbal, mental, even physical abuse." Exh. D (Ltr. from Cindy Ly) at 5.

Empirical data corroborates the experience of the Pham family.  "Children and families from immigrant and refugee communities entering new lives in the United States are at risk of traumatic adjustment."[6]  Particularly, such experiences in youth are associated with "higher rates of depression, anxiety, post-traumatic stress syndrome (PTSD), heart disease, metabolic syndrome, and early death."[7]  The experiences of Vietnamese Americans in particular may influence their long-term psychological health — "pre- and post-migration traumas" are especially significant in predicting lifelong health outcomes.[8]  "Intergenerational transmission of trauma" can also be a "determinant of mental health" for refugee children and families. The traumatic experiences of parents can substantially impact their children's lives and health outcomes.[9] "Enduring stress and trauma has pernicious psychological and physiological repercussions that

---

[6] Schmitz, Cathryne L., Michelle Vazquez Jacobus, Catherine Stakeman, Grace A. Valenzuela, and Jane Sprankel. "Immigrant and Refugee Communities: Resiliency, Trauma, Policy, and Practice." *Social Thought* 22, no. 2–3 (January 1, 2003): 135–58. https://doi.org/10.1080/15426432.2003.9960346.
[7] Miller, Kathleen K., Calla R. Brown, Maura Shramko, and Maria Veronica Svetaz. "Applying Trauma-Informed Practices to the Care of Refugee and Immigrant Youth: 10 Clinical Pearls." *Children* 6, no. 8 (August 2019): 94. https://doi.org/10.3390/children6080094.
[8] Kim, Isok, Mary Keovisai, Wooksoo Kim, Sarah Richards-Desai, and Asli C. Yalim. "Trauma, Discrimination, and Psychological Distress Across Vietnamese Refugees and Immigrants: A Life Course Perspective." *Community Mental Health Journal* 55, no. 3 (April 1, 2019): 385–93. https://doi.org/10.1007/s10597-018-0268-2.
[9] Vaage, Aina B., Per H. Thomsen, Cécile Rousseau, Tore Wentzel-Larsen, Thong V. Ta, and Edvard Hauff. "Paternal Predictors of the Mental Health of Children of Vietnamese Refugees." *Child and Adolescent Psychiatry and Mental Health* 5, no. 1 (January 10, 2011): 2. https://doi.org/10.1186/1753-2000-5-2.

have affected first and later generations of Vietnamese American refugees."[10]

Tony's mother suffered from undiagnosed bipolar disorder. The children suffered. PSR ¶ 95; *see* Exh. B (Ltr. from David Pham) at 4; Exh. A (Ltr. from Christy Lee) at 5; Exh. C (Ltr. from Peter Pham) at 2; Exh. D (Ltr from Cindy Ly) at 3–4.   In addition, Tony's father was an alcoholic. Tony's father told the children that "his job in Vietnam required wining and dining and that's how he justified his love for wine." Exh. C (Ltr. from Peter Pham) at 2.  Familial/parental alcoholism "has been associated with many behavioral and emotional difficulties" among children.[11] Overall, such exposure can be linked to changes or adverse effects in "psychosocial functioning" throughout adolescence.  Children of alcoholics are at increased risk for a variety of psychosocial problems. The most studied of these problems is an increased involvement in alcohol and drugs."[12] Moreover, familial substance abuse can often coexist with other adverse environmental factors, such as "exposure to family violence," as was the case in Tony's family — the factors reinforce each other and mutually exacerbate the adverse impacts they can have on children.[13]

---

[10] Maffini, Cara S., and Alfonse N. Pham. "Overcoming a Legacy of Conflict: The Repercussive Effects of Stress and Intergenerational Transmission of Trauma Among Vietnamese Americans." Journal of Aggression, Maltreatment & Trauma 25, no. 6 (July 2, 2016): 580–97. https://doi.org/10.1080/10926771.2016.1182955.

[11] Ritter, Jennifer, Michael Stewart, Christine Bernet, Michael Coe, and Sandra A. Brown. "Effects of Childhood Exposure to Familial Alcoholism and Family Violence on Adolescent Substance Use, Conduct Problems, and Self-Esteem." Journal of Traumatic Stress 15, no. 2 (April 1, 2002): 113–22. https://doi.org/10.1023/A:1014803907234.

[12] *Id.*

[13] *Id.*



Tony, top left, recognized as salutatorian of his high school.

Christy was beaten by her father for getting bad grades, talking to a boy on the phone, and sneaking out to go to the movies. Exh. A (Letter from Christy Lee) at 3. David witnessed "Dad kicking Christy while she was in a fetal position trying to protect herself" because their parents "caught her speaking on the phone with a boy in the middle of the night." Exh. C (Letter from Peter Pham) at 3. Both parents used their hands or objects, such as sticks or broomsticks, to physically abuse their children. PSR ¶ 95. The beatings were most severe when their father had been drinking. Their father "frequently yelled at my brothers of making too much noise," and "did not allow them to take showers every day' because "[h]e said their showers interrupted his sleep." Exh. D (Ltr. from Cindy Ly) at 4. Love was scarcer than food. Tony's parents never told their children that they loved them. *See* Exh. D (Ltr. from Cindy Ly) at 3. "When he drank, his face got red and he would get very mean . . . ." *Id.* at 4. Cindy recalls that her parents were "irritable, unhappy, and temperamental most of the time," and that her mother "had a very hot temper and was often moody. We never knew when she would explode." Exh. D (Ltr. from Cindy Ly) at 4.

E.  <u>Tony felt significant pressure to succeed from his parents and his cultural upbringing.</u>

In 1987, Tony graduated from East Kentwood High School in Grand Rapids, Michigan as the salutatorian with a GPA of 3.979. PSR ¶ 115. Exh. G (East Kentwood High School records). He was voted most likely to succeed. Although he was an excellent student, high school was a terrible time for Tony. Tony was interested in extracurricular activities, but his parents discouraged him from participating in anything that would distract from academic achievement. *See* Exh. B

(Ltr. from David Pham) at 3; Exh. C (Ltr. from Peter Pham) at 2. Tony walked home or rode his bike five miles to participate in the musical, National Honor Society, the school newspaper, soccer, track, forensics, and vocal music. In order to impress upon Tony and his siblings the importance of an education, their parents, who were both factory workers, made Tony and all of his siblings work in a factory the summer they turned 18, "so that we can experience the extreme physical and mental hardships of factory life" in order "to push us to get an education rather than work as a laborer." Exh. A (Ltr. From Christy Lee) at 3.

The Pham household was marked by an incredible pressure to succeed, as they defined success. Excellence meant entrepreneurship, starting a business, and making as much money as possible. "The entrepreneurial spirit of the Vietnamese people has expanded in scope from small traders to more organised business models."[14] Tony's parents had status and wealth in Vietnam but were refugee factory workers in America. They looked to their children to restore the family's reputation. Tony worked to epitomize the entrepreneurial spirit of his culture and become a successful businessman quickly. Cindy explained that her parents "were under considerable pressure to be the best, so expectations were high for us, the kids. In our culture, pride, reputation, and status is everything." Exh. D (Ltr. from Cindy Ly) at 4. Cindy recalls, "My parents would constantly compare us to other families. They would say that other family was nobody in Vietnam and look at their kids now, studying to be a doctor." Exh. D (Ltr. from Cindy Ly) at 5.

From his "life growing up with his parents," David recalls, "I was under much pressure to excel in school but nothing else." Exh. B (Ltr. from David Pham) at 3. David recalls that when he dropped out of college, his father told him that he was "ashamed because it brought dishonor to

---

[14] H.T.T. Nguyen and H.T.S. Pham, *An Exploration of Vietnamese Entrepreneurs*, in J. Gibb & J. Scott, eds., Research Handbook on Entrepreneurship in Emerging Economies: A Contextualized Approach (2019), available at https://www.researchgate.net/publication/341264520_An_exploration_of_Vietnamese_entrepreneurs/.

the family and set a bad example for [his] siblings," and afterwards David "never felt worthy of being the oldest brother." *Id.* at 4. Peter confirms that their father "disavowed" David after he dropped out "and no longer spoke to him." Exh. C (Ltr. from Peter Pham) at 3. Cindy also dropped out of college after her parents groomed her (including by forcing her to receive cosmetic surgery on her eyes) for an arranged marriage with a Vietnamese man.  After David and Cindy dropped out of college, "[a]ll pressure was now on Tony, the next oldest boy," and "tension between . . . Tony [and his parents] escalated." Exh. D (Ltr. from Cindy Ly) at 6. Peter recalls telling a friend in school that he "felt like committing suicide" after getting a C+ on a report card, and that "[d]inner conversation was usually Dad describing the sons of Vietnamese men he knew that got graduate-level degrees and made six-figure salaries." Exh. C (Ltr. from Peter Pham) at 3. Cindy explains that "[m]y mom always told us we were the only family my dad had, and his three boys were the only males in his family that have a future and can carry on the family's name. That put enormous pressure on my brothers." Exh. D (Ltr. from Cindy Ly) at 4.

i.   Straying from the "norm" of Vietnamese culture resulted in physical and verbal abuse.

Tony's parents increasingly saw him as "Americanized," and responded with physical abuse. Tony was often beaten with sticks and verbally berated to the point of total humiliation and shame.  "Children of Asian-American immigrants tend to assimilate into American culture quicker than their parents. This leads them to develop certain habits and mannerisms that could be understood by their parents as being disrespectful and needlessly rebellious. This becomes the cause of intergenerational conflict.[15]" Tony was interested in dating, which his parents forbade. Brother Peter explained that "Tony had it worst among the siblings because he fully embraced the

---

[15] https://www.apa.org. "Great Expectations: Exploring Family Dynamics and Stress Among Asian-Americans/Pacific Islanders." Accessed June 22, 2021.

American culture – having a lot of friends, participating in extra-curricular activities, and having a girlfriend – and that resulted in more verbal and physical abuse than the rest of us." Exh. C (Ltr. from Peter Pham) at 3. Cindy confirmed that "Tony suffered the most growing up. He was the middle child, rebellious, outgoing, and did the opposite of almost everything my parents told him not to do, worst yet he was stubborn. This resulted in more verbal, mental, and physical abuse." Exh. D (Ltr. from Cindy Ly) at 5. Tony's mom "called him a devil, evil" and "said she wished she never brought him into this world so that he could torment her." Exh. D (Ltr. from Cindy Ly) at 5. Cindy recalls that Tony "put up a brave face" and would not cry when hit by his parents, "which resulted in additional spanking." *Id.*

In high school, Tony dated a white woman. Tony's mother drove her car into Tony's car to prevent him from driving off to see his girlfriend. *See* Exh. A (Ltr. from Christy Lee) at 4; Exh. C (Ltr. from Peter Pham) at 4. His parents then kicked Tony out of the house. *See* Exh. D (Ltr. from Cindy Ly) at 6.

ii.   The damaging effects of alcohol in Tony's life started surfacing when he was only five, and he has struggled with alcohol every day since.

First exposed to alcohol forcibly at the age of 5, Tony began to abuse alcohol again in junior high school, and his drinking escalated in high school. When he was 16, he traveled to Belgium to study abroad on an International Scholarship Award sponsored by the Steelcase Corporation. It was legal for Tony to drink beer in Belgium, and he heavily indulged. *See* Exh. D (Ltr. from Cindy Ly) at 6. After returning from Belgium, Tony got his first minor in possession citation for alcohol at the age of 16. After he was picked up from the police station, "Tony received a horrible beating with a stick that night" from his father. Exh. A (Ltr. from Christy Lee) at 5. *See also* Exh. C (Ltr. from Peter Pham) at 4 ("I just remember being very surprised and somewhat shocked that the stick broke since it was so thick."). During college, Tony drank 4–5 nights per

week, frequently to the point of blacking out.

Despite turmoil in the home, Tony achieved academic success in the relatively easy-to-achieve forum of high school. But his successes were never acknowledged by his parents and became more challenging in college. Cindy recalls:

> I considered Tony the smartest out of us five, but I don't think I ever heard my parents praise Tony for any of the accomplishments he achieved in school. It's expected. I think according to my parents, giving approval or compliments would allow Tony to slack off and not try harder. When he won just about every award given in high school that day, even chess, my parents almost didn't come and when everyone clapped for him, they didn't show any emotion. They considered high school not important. These awards included some extra-curricular activities, so they are more so not important. When Tony graduated from high school, I had to convince my parents to attend his graduation because he would be giving a speech as valedictorian of his class.

Exh. D (Ltr. From Cindy Ly) at 6.

Tony graduated high school and went onto study Engineering at the University of Michigan. On August 23, 1991, Tony graduated *cum laude* from the University of Michigan in Ann Arbor, Michigan, with a Bachelor of Science degree in Computer Engineering, after only seven semesters. PSR ¶ 116. Exh. H (University of Michigan transcript). Tony met his wife, the former Anh Kim Duong, while in college, and after he graduated, he stayed in Ann Arbor to wait for his wife to graduate. He attended graduate school, pursing a master's degree in computer engineering, at the University of Michigan. The program was incredibly rigorous. He attended for a semester or two, but it was difficult and did not seem to be worth it to pursue a master's degree (and he certainly did not think it made sense to pursue a Ph.D.). Tony's parents taught him not to value higher education and instead to put a premium on making as much money as soon as possible. Tony left graduate school and went into business. He and his wife were married in 1994, in a traditional Catholic ceremony.



Tony and Anh marry in 1994.

Tony's siblings confirm that the stress that Tony experienced from his parents continued after his marriage to Anh. Cindy related that "Anh's family is one of the reasons Tony needed to be successful," and that Tony "needed approval and acceptance from Anh's parents" and "wanted to show Anh's parents he was good enough for her." Exh. D (Ltr. from Cindy Ly) at 8. Anh told Tony's sister Cindy that "all her siblings are very successful, and she feels sad for herself and her children." *Id.* at 7–8. Tony "wanted to redeem himself, especially to his in-laws, by showing everyone he was capable of taking care of his family." *Id.* at 8. A few years after they married, Tony and Anh started their family. They welcomed their first child, a son, in 1998. A year later, Anh gave birth to their eldest daughter. Next in 2002, they welcomed another son, and another daughter in 2006. Their family was complete when they had their youngest, a son, in 2010. Tony's greatest joy became his children, but with five more mouths to feed, the pressure to provide compounded. Tony and Anh are devout Catholics, <u>see</u> Exhibit T (letter of good standing and bulletin), and subscribe to the belief that children are "begotten not made," and arise out of an act of love between a husband and wife in cooperation with God.[16] Tony shares a special relationship with each of his children, as evidenced by their letters to the Court. *See* Exh. E (Letter from

---

[16] United States Conference of Catholic Bishops, <u>Begotten Not Made: A Catholic View of Reproductive Technology | USCCB</u> (Last Accessed November 8, 2021).

Christian Pham); Exh. Z (Letter from Lauren Pham).

Tony's siblings related that Tony is "selfless and simple," "doesn't care for extravagant things and doesn't care to go out with friends. He loves to save in order to provide for his family." Exh. D (Ltr. from Cindy Ly) at 10. "There is no stronger testament to Tony's character and goodness than the success of his children." Exh. B (Ltr. from David Pham) at 5. Tony is an incredibly dedicated, invested and involved father. *See* Exh. A (Ltr. from Christy Lee) at 7–8. "Tony's world is his wife and his kids." *Id.* at 8. Tony's sister Christy describes him as "an amazing brother, husband, and father." *Id.* at 7. "Tony is incredibly devoted to his children and wife." Exh. C (Letter from Peter Pham) at 4. He works hard for his family and rarely spends money on himself. His wife, Anh speaks to his selflessness and commitment to the family. "He works hard for his family and rarely spends money on himself." *See* Exh. Y (Letter from Anh Pham).

F.  <u>Although he was taught not to discuss family secrets, Tony is beginning to address his extensive trauma history.</u>

*"I was sexually molested as a child. I was forced to drink and then I was raped." Tony finally said it out loud. Tears stream down his face; his eyes are clenched shut. He opens his eyes. Ken Richmond looks at Tony with sympathy. Afterall, he understands why it may take some people a lifetime to disclose abuse. He passes Tony a box of tissues, "How do you feel?", he asks.*

\*\*\*

Tony opened himself up to evaluation by Dr. Robert Ortega, who concluded that he has a highly complex trauma history, and is "cognitively and emotionally compromised, due to his child sexual abuse and other forms of extreme trauma that were untreated." Ortega Report at 6. Only in the last few months has Mr. Pham come to acknowledge long-suppressed substance abuse and mental health issues. He has embarked on a course of treatment that will for the first time address "[h]is extreme motivation to succeed, to overachieve, to please," Ortega Report at 27, factors that

drove the offense conduct in this case.  According to Dr. Ortega:

> The research offers a wide array of reasons for delay in disclosure. Research on disclosure of child sexual abuse focused on men suggests that men often wait until adulthood to disclose their child sexual abuse. This was especially the case for older men who were abused by a family member, as it is in Mr. Pham's case. Disclosure in childhood brings many fears. Mr. Pham's reticence to disclose until recently aligns with research indicating certain fears and cultural impediments that prevented him from disclosing such as fear of what will happen to him if he discloses his sexual abuse especially by another (male) family member including fear of being blamed or accused of lying. Mr. Pham likely feared disbelief by others, and was wary of the emotional toll and impact of the abuse on his family and within his cultural community. The research also points to other impediments to disclosure such as the lack of opportunity to tell, and concern about the safety of self and others once the disclosure becomes public. There may also be positive feelings toward the abuser who is a close relative. Mr. Pham's failure to identify a specific perpetrator other than it was a family member is inconsistent with all other factors he can recall suggesting he is either blocking the abuser's identity or protecting the abuser. Mr. Pham also raised concern about a power dynamic between him and his abuser in which the abuser appears to have used admonitions for not acquiescing such as loss of his love or affection or loss of privileges, and withholding food.

Ortega Report at 12–13.

Mr. Pham sought out treatment for his complex trauma and PTSD, anxiety, and substance abuse from Katie Papke, LMSW, CAADC, CCTP, CCHTVSP.  *See* Exh. O (Treatment Plan, Katie Papke, LMSW). He is also participating in Eye Movement Desensitization and Reprocessing (EMDR) treatment with Richmond Consulting, LLC. *See* Exh. V (Richmond Counseling, LLC Client Records). He has been sober since July 2021 and has been attending Alcoholic Anonymous meetings regularly. Exh. P (AA attendance records). He sought out and took prescribed medication that aided with alcohol cessation.  Exh. U (alcohol cessation records).  Tony has also recently started marriage therapy with his wife.

Since August 30, 2021, Tony has worked full-time at Manna Café, a Christian-based

18

restaurant that is part of Manna Ministries. *See* Exh. C (Letter from Peter Pham) at 6. He previously worked as a manager at Alfano's Restaurant.  Tony also continues to serve his Catholic Church as a lay eucharistic minister and a member of the church choir. Exh. C (Ltr. from Peter Pham) at 6; Exh. T. Tony recently sought and received permission from the Court to volunteer for Habitat for Humanity ReStore program in his community. *See* ECF Nos. 169, 173 & 174.

## II.     Nature and Circumstances of the Offense

In 1960s Vietnam, achieving success meant being a business owner.  Tony's parents also believed that success meant making money in business.  They did not value higher education, nor did they value professions like medicine and law that many Americans value. In Vietnamese culture, and more specifically in Tony's family, being a successful businessman (a successful entrepreneur) is the epitome of "making it big:"

> If you look from the perspective that this is a group of people who came from '75 with nothing on their backs, basically, they lost everything. They lost their country, they left their possessions, they left in panic . . . they have nothing. They are in a very, very desperate situation. And then, barely ten years after that, they succeeded to come back from the brink. They succeeded to establish a good, vibrant business community. They succeeded to make a decent living for their family. So the two biggest successes of the Vietnamese community is the business community, a very vibrant business community, and the academic successes of the younger Vietnamese.[17]

Moreover, Vietnamese entrepreneurs generally are less susceptible to the 'fear of failure' mentality endemic in many countries' startup culture. Whether because of pride or necessity, many local entrepreneurs embrace the unpredictability and volatility that comes with founding a company.[18] Vietnamese culture is characterized by being a collectivist society. Children are duty-

---

[17] Interview with Nguyen Trong Loc, July 29, 1993, as quoted in Vu Hong Pham, *Cultural Crossroads: The Formation of Vietnamese American Consciousness for the 1.5 Generation* (1994), *available at* https://oac.cdlib.org/view?docId=hb5x0nb45r&brand=oac4&doc.view=entire_text.

[18] How Vietnamese Culture Lends Itself to Entrepreneurship, Startup Universal, December 25, 2019 (Last Accessed November 7, 2021).

bound to take care of their families.[19]

Tony was expected to be a successful businessman so that he could provide for his family.

Failure was not an option. Failing would bring shame upon Tony and worse, upon his entire family.

In his evaluation with Dr. Ortega, Tony admitted:

> Mr. Pham said his mother made him feel like a piece of junk every day and it had a huge impact on his self-esteem. He said he doesn't like it when people put him down even when they offer constructive criticisms. He said he views them as attacks and described himself as a "fighter." Mr. Pham said he feels like he always must fight - for his kids, his work - and it gets tiring with many things stacked against him. **He said that pattern reflected on his approach to building a successful business. He said he had to make his business succeed.**

*See* Ortega Report at 12.  Within the framework of searching for entrepreneurship, Tony also struggled with his unaddressed trauma, low self-esteem, and people pleasing behavior.

In the late 90s and early 2000s Tony was employed as a computer engineering contractor. His wife was not working, and he supported the entire family.  He commuted to Chicago, which although it was a grueling commute, paid a better salary.  In the early 2000s, the dot-com bubble burst and work in the computer field dissipated.  In 2005, Tony Pham met Charles Thao, a co-defendant in his prior case, through his friend Tong Vang, also a co-defendant. Thao claimed to be a board-certified naturopathic physician, and to have researched and developed various dietary supplements. *See* 2009 PSR¶ 16. Tony was won over by Mr. Thao and his persuasive ability, and agreed to become associated with Techmedica Health, a company intended to serve Mr. Thao's network of sales. Defendant Tony T. Pham's Memorandum in Aid of Sentencing at 9, ECF No. 183 (W.D. Mo. Oct. 14, 2010) ("2010 Sentencing Memo") at 9; 2009; PSR ¶ 96. Tony had been groomed to "people please" since his was a young child. That is evident even how he describes his

---

[19] PBS, Living in Two Cultures:  Interview with Andrew Yang, *available at* https://www.pbs.org/wgbh/americanexperience/features/daughter-living-two-cultures/

sexual abuse trauma. *See* Ortega Report at 18.  After being abused he was always told he "did a good job", and he harbors guilt, even today, because he wonders if he enjoyed the abuse because of the praise he received. Ortega Report at 19. Tony has an "emotional dependence on people, building him up." *Id*. at 12. Tony wanted to impress Mr. Thao and be viewed as an asset to the company. Tony was hired to provide his expertise in computers and the internet, and gradually became involved in the process of drafting language for labels and internet advertising at the direction and with the approval of Dr. Thao. 2010 Sentencing Memo at 3; 2009 PSR ¶ 96.

Tony believed that, first and foremost, Mr. Thao's aim was to benefit and assist his customers with his array of health products which he persuaded Tony, together with many others, would ameliorate and cure a wide variety of ailments and maladies. 2009 Sentencing Memo at 1–4. Tony made efforts to confirm some of Dr. Thao's tests and claims, but Dr. Thao persisted in his assertion of their legitimacy and was able to convince Tony that the claims were true and accurate through fraudulent documentation and fraudulent email exchanges with fictious research doctors who supposedly worked for Dr. Thao. PSR ¶ 96. Later, Tony realized how he had been deceived by Mr. Thao. Mr. Pham was indicted in the Western District of Missouri and pled guilty to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i). *See* Plea Agreement. *United States v. Pham*, No. 6:08-CR-3019 (MDH), ECF No. 112 (W.D. Mo. July 6, 2009).

The totality of the circumstances presented in Tony's previous case exhibits the power of a Svengali-like figure over a young, ambitious and gullible man. *See* Sentencing Memorandum, ECF No. 183 at 11.  Mr. Pham was taken in by the persuasion and charm of Mr. Thao. Aside from a salary of approximately $8,000 a month, Mr. Pham did not otherwise personally gain from Mr.

Thao's scheme. *See id.* ¶¶ 128, 132; Sentencing Memorandum, ECF No. 183 at 9; ███████████ ███████████████████████████████████████████████████████ Mr. Pham was sentenced to 36 months' imprisonment. Judgment, *United States v. Pham*, No. 6:08-CR-3019 (MDH), ECF No. 193 (W.D. Mo. Nov. 29, 2010). The Court did not impose a fine or order Mr. Pham to pay any restitution. The lead defendant, Mr. Thao, received a total effective sentence of 97 months' imprisonment. Judgment, *United States v. Thao*, No. 6:08-CR-3019 (MDH), ECF No. 194 (W.D. Mo. Nov. 29, 2010). Mr. Pham entered federal custody on his previous federal conviction on December 17, 2010. PSR ¶ 81. He was released to a residential reentry center (RRC) on August 28, 2012, and on November 7, 2012, he was released to home confinement. *Id.*

Tony Pham met Monte G. Warren, Register No. 32415-160, while participating in the RDAP program at FCI Morgantown. Warren was serving a 24-month sentence for fraud. Warren was the defendant in over fifty civil lawsuits in Cuyahoga, County Ohio, all seeking money damages. *See* Exh. W (Monte Warren Civil Cases). Tony and Monte became friends over time, and about three months prior to his release, Warren brought up the idea of starting a prison consulting business. The purpose was to advise incoming prisoners about how to prepare for prison, BOP policies, and BOP programs, including the RDAP program. Warren planned to start up the business along with Cliff Wimberly, a former BOP inmate who had also completed the RDAP program.

Tony was aware that there was a market for prison consulting businesses. While in custody, inmates often received literature and pamphlets from prison consulting firms around the country. These firms offered services to inmates similar to the ones Monte Warren planned on offering in his new business. Warren asked Tony if he would work for him when he was released, and Tony agreed.

Warren was released about three months before Tony. Warren's business partner, Kalvin

Brown incorporated RDAP Law Consultants in September 2012 *See* Exh. S (Articles of Organization for a Domestic LLC), and also set up the website and infrastructure and started marketing and acquiring clients. When Tony was released to home confinement in November 2012, Warren had already set up a small office, phone and internet set up for Tony near his home so that he could begin work. Tony was paid mainly based on commission at about 25–50% of what he was able to contribute, depending on expenses.

 Tony assisted with setup, strategy, consulting, sales, and marketing. Warren managed the finances for the entire company and the employees in the main office in Cleveland, and Tony managed the employees in Michigan, including co-defendant Sam Copenhaver. Warren was owner and President of the business.

The business was not just helping people get into RDAP. Tony and his associates also helped prepare Second Chance Act administrative filings for clients, and also advised clients on BOP policies and procedures and what to expect when serving a federal prison sentence.

At first, Tony and his associates did not encourage inmates to exaggerate their substance abuse issues or to lie to get into RDAP. However, many clients were getting rejected, and the company guaranteed a 100% refund to clients who did not gain admission to RDAP. Increasingly, Tony and his associates coached clients to exaggerate their substance abuse issues or to outright lie to the BOP.

In 2016, Warren wanted to take less responsibility and devote more of his time to real estate development. Tony paid him $25,000 in order to keep the RDAP business and most of the profits. Even though Monte stepped away from RDAP in 2016, he continued to do business with Cliff Wimberly and Kalvin Brown. There is a lawsuit from 2017, Fairway Partners, Ltd. V. Amish Builders, et al, that names as defendants Warren, Brown and "Amish-Builders-Electrical-

Plumbing Service" c/o Clifford Wimberly. *See* Exh. X (Civil Parties Sheet). Warren remained involved in strategy and management until his death in 2017, at which point Tony took over the business. On December 29, 2017, the first of many cooperating witnesses recorded a call with co-defendant Constance Moreland and Tony Pham. PSR ¶19. Mr. Pham was arrested on January 23, 2019. PSR ¶ 62. He entered a guilty plea on December 4, 2019 to Count One and County Nine of the Indictment, taking full responsibility for his conduct. *See* ECF No. 80.

## IV.     Legal Argument

The underlying causes of Mr. Pham's conduct relate back to a constellation of factors including experiencing profound war violence during the Vietnam War and aftermath, forced separation from his parents at the highly impressionable age of five, forced alcohol consumption and related sexual abuse by a family member, food scarcity, physical abuse, verbal abuse, and severe pressure to succeed by which success is defined as making as much money as possible. Only following Tony's arrest in this case has he been able to grapple with the severity of this trauma and the resulting problems it has caused in his life. Mr. Pham has served a sentence of incarceration before.  In such an instance it is tempting to say that the prior term of incarceration was insufficient and that a longer term now is necessary.  Incremental punishment is not the answer here, however, because the most significant aspects of Mr. Pham's history and characteristics were not put before the previous Court, and the prior term of incarceration did nothing to address the root causes of the offense. Those root causes have only recently come to light and are beginning to be treated.  The only way to address Mr. Pham's behavior adequately is to impose a sentence that continues to address those underlying factors, such as through implementing a treatment plan as suggested by Dr. Ortega.  *See* Ortega Report at 28-29.

A.     The Court Should Depart or Vary Downward Pursuant to U.S.S.G. § 5H1.3 Based on Mr. Pham's Mental and Emotional Conditions.

The Court should grant a downward departure and/or variance based upon Mr. Pham's never-before discussed or treated history of complex trauma.  Pursuant to USSG § 5H1.3, "mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually, or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines." Pursuant to USSG § 5K2.0(a)(2), the Court can depart based upon circumstances that the Sentencing Commission has identified or not identified in the guidelines that are relevant in determining the appropriate sentence.[20]  Tony's diagnosis of PTSD, Generalized Anxiety Disorder, and alcohol abuse disorder is not surprising, given all that he witnessed and suffered at such a young age. *See* Exh O (Katie Papke, LMSW Diagnosis and Treatment Plan).

In 1990, two doctors conducted a landmark study that revealed a link between what they termed Adverse Childhood Experiences (ACEs) and later medical outcomes.  ACEs included physical and sexual abuse, physical and emotional neglect, and family dysfunction, such as having parents who were divorced, mentally-ill, addicted, or in prison.[21]  The doctors found that there was a robust relationship between ACEs and poor health outcomes such as depression.  More ACEs correlated with worse outcomes and fewer ACEs correlated with better outcomes.  ACEs are associated with learning and behavioral problems, which translate into higher rates of workplace absenteeism, financial problems, and lower life-time income.[22]  The study's groundbreaking

---

[20] See, e.g., United States v. Thomas Recck, 15cr15(JAM), Transcript (doc. #42) (referring to Mr. Recck's combination of mental health issues and addiction in imposing a below guideline sentence of probation); United States v. Laudato, No. 3:13-CR-121-AWT, Doc. # 60 (D. Conn. July 14, 2014) (imposing below guideline sentence based in part on mental/emotional condition leading to a gambling addiction); United States v. Jones, No. 3:17-CR-281-JBA, Doc. # 60 at 49, 51 (D. Conn. Sept. 28, 2018) (imposing non-prison sentence recognizing that the defendant suffered from "a gambling addiction, particularly associated with alcohol addiction and stemming from a traumatic childhood experience," and observing that the offense "took place in relation to a gambling addiction that raised the need for money far beyond anything his legitimate employment was going to provide").

[21] See Bessel Van Der Kolk, The Body Keeps Score: Brain, Mind, and Body in the Healing of Trauma at 146 (2014).

[22] Id.

25

contribution was a detailed account of how children do not "grow out" of traumatic experiences – they carry the marks of that trauma in their brains and in their bodies.

Tony was evaluated for ACEs today by Dr. Ortega, and he received a significantly high score. He experienced direct trauma in the form of Vietnam War violence and then being separated from his parents at the age of five, sexual abuse, physical abuse in the form of forced drinking and beatings, and emotional abuse. He experienced a parent who was an alcoholic and a parent with untreated mental illness. He also experienced stress as a child refugee and an immigrant assimilating into American culture. His struggles with anxiety and PTSD, as well as his long battle with alcohol dependence are therefore unsurprising in light of the science of childhood trauma.

Mr. Pham was evaluated by Robert M. Ortgea, Ph.D., LMSW co-director of the Family Assessment Clinic in Ann Arbor, Michigan. Dr. Ortega concluded that "Mr. Pham's functioning difficulties are clear," and identified "multiple mental health challenges" that "seriously affect his judgment and decision-making." Dr. Ortega evaluated Tony's adverse childhood experiences and illustrates how they have impacted his adult life:

> Mr. Pham described his extensive experiences of trauma throughout his childhood, including his sexual abuse. His transition to the US and Michigan, and reunification with his parents after being separated further exposed him to adverse experiences as indicated by the Adverse Childhood Experiences (ACES) inventory including: (1) That as a child his parents often or very often swore at him, insulted him, put him down, and humiliated him, and acted in a way that made him afraid that he might be physically hurt; (2) That one or both parents often or very often pushed, grabbed, slapped, or threw something at him or hit him so hard he had marks or was injured; (3) That an adult or person at least five years older than him touched or fondled him; (4) That he was kicked out of his home as an adolescent and often or very often felt that no one in his family loved him or thought he was important or special, or his family didn't look out for each other, feel close to each other, or support each other; (5) That as a refugee he often or very often felt that he didn't have enough to eat, had to wear dirty clothes, and had no one to protect him, and when united with his parents, believed

his parents (i.e., his father) were too drunk or mentally ill (i.e., his mother) to take care of him; (6) That his parents were lost to him when he had to flee S. Vietnam and then later on when he was kicked out of the home as an adolescent; (7) That he witnessed his mother and father pushing, grabbing, slapping, or had something thrown at them, hit with a fist, or hit with something hard, and witnessed his mother chase and threaten his father with a knife; (8) That his father was a problem drinker or alcoholic; and (9) That his mother was depressed or mentally ill (bipolar).

*See* Ortega Report at 3-4.  Dr. Ortega explained:

> Extensive research, focused specifically on ACES, demonstrates that adverse childhood experiences manifest in severe health and mental health challenges in later adult life. Noteworthy from the research is the cumulative impact of multiple adverse experiences such that more experiences increase the severity of negative health and mental health outcomes. Mr. Pham's ACES experiences are extremely excessive and potentially devastating if left untreated.[23]
> Mr. Pham's responses to the ACES inventory do not appear exaggerated, and are consistent with sibling responses in collateral interviews about their own and Mr. Pham's childhood.

*Id.* at 4.   Dr. Ortega identified the "convergence of several factors" that contributed to Mr. Pham's

mental and emotional conditions, including the following:

> 1. Mr. Pham has lived through a highly complex traumatic childhood through exposure to extremely difficult and adverse childhood experiences. He witnessed the violence of war, refugee escape and resettlement, separation from his family of origin, and faced basic survival while living in two refugee resettlement camps.
>
> 2. Mr. Pham was the victim of repeated sexual abuse by someone he trusted, that used manipulation that connected his submission to rewards such as personal validation, affection and possibly access to daily living such as food,

23 Edwards, V. J., Holden, G. W., Felitti, V. J., & Anda, R. F. (2003). Relationship between multiple forms of childhood maltreatment and adult mental health in community respondents: Results from the adverse childhood experiences study. *American Journal of Psychiatry*, *160*(8), 1453–1460. http://dx.doi.org/10.1176/ appi.ajp.160.8.1453; Green, J. G., McLaughlin, K. A., Berglund, P. A., Gruber, M. J., Sampson, N. A., Zaslavsky, A. M., ... Kessler, R. C. (2010). Childhood adversities and adult psychiatric disorders in the national comorbidity survey replication I: Associations with first onset of DSM-IV disorders. *Archives of General Psychiatry*, *67*(2), 113–123. http:// dx.doi.org/10.1001/archgenpsychiatry.2009.186; Jones, T.M., Nurius, P., Song, C. & Fleiming, C.M. (2018). Modeling life course pathways from adverse childhood experiences to adult mental health. *Child Abuse and Neglect*, *80*, 32-40; Nurius, P. S., Green, S., Logan-Greene, P., & Borja, S. (2015). Life course pathways of adverse childhood experiences toward adult psychological well-being: a stress process analysis. *Child Abuse & Neglect*, *45*, 143–153. http://dx.doi.org/10.1016/j.chiabu.2015.03.008.

clothing, and basic survival.

3. Once reunited with his family after being separated for approximately 2 years, Mr. Pham experienced within his family, heightened expectations of excellence in his education or else faced extreme and relentless forms of corporal punishment and psychological abuse, while living in a household with an alcoholic father, mentally ill mother, and exposure to extreme forms of domestic violence.

4. Mr. Pham functioned through impressionable years under a cloud of fear that his sexual abuse would somehow be uncovered and included his constant fear of being ostracized by his family and community, and that disclosure would bring severe retaliatory consequences by his family against the family member who was his abuser.

5. Mr. Pham has many conflicts, intra-personally, interpersonally (including marital), and culturally that bear heavy weight on him in his desperate search for validation and legitimacy. While clearly cognitively distorted in terms of how he determines the best ways to resolve these conflicts, they present for him a colossal challenge that clouds his judgement, forcing him to resolve his conflict in the immediate with little thought on the long-term consequences. His long-standing alcohol use and dependence, since age five years, contributes mightily to his lack of forethought.

Ortega Report at 28.  Dr. Oretga concluded that "Without his extensive complex trauma that includes being repeatedly sexually abused, and in the absence of treatment, it is reasonable to conclude that his functioning difficulties would not be compromised." Ortega Report at 6.

B.     A downward departure and/or variance is warranted under § 5H1.4 in order to accomplish a treatment objective.

Community-based treatment along with rigorous supervision is the most effective way to deter Mr. Pham and protect the community.  "In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose."  USSG § 5H1.4 (citing § 5C1.1, Application Note 6).  A downward departure is therefore, appropriate to accomplish the "specific treatment purpose" of treating his complex PTSD, generalized anxiety disorder and severe alcohol abuse disorder, thus making him less likely to recidivate.

Imprisonment will be unable to treat and will exacerbate Mr. Pham's mental health issues.

28

The psychological effects of incarceration are well documented.  In addition to finding that constant guard supervision and the accompanying lack of privacy are "psychologically debilitating," there is a growing consensus that incarceration itself is a source of trauma.[24] United States prison services for the mentally ill are "woefully deficient."[25]  Mentally ill offenders are often neglected and isolated.[26]  Some commit suicide while awaiting treatment.[27]  Mentally ill inmates are also more likely to be vulnerable to attacks by other inmates.[28]  For many inmates, the only exposure they will have to the prison's psychology department will be their admission interview.  Reduced funding within the BOP has pared psychology programs down to the bare minimum.[29]

A November 2018 report jointly published by *The Washington Post* and the Marshall Project details remarkably inadequate access to inmate mental health services in federal prisons. The authors found that even though 23% of federal inmates have been diagnosed with a mental illness, the Bureau of Prisons classifies only 3% of inmates as having a mental illness serious enough to require regular treatment.[30]  A recent BOP policy promising better care and oversight for inmates with mental-health issues resulted not in the expansion of treatment, but instead, in the lowering of the number of inmates designated for higher care levels by more than 35 percent.[31]

---

[24] See, e.g., Mika'il DeVeaux, The Trauma of the Incarceration Experience, 48 HARV. C.R.-C.L. L. REV. 257, 258-59 (2013); Marieke Liem & Maarten Kunst, Is There a Recognizable Post-incarceration Syndrome Among Released "Lifers"?, 36 INT'L J. L. & PSYCHIATRY 333-37 (2013) (suggesting that there may be a Post-Incarceration Syndrome that shares characteristics with PTSD, but that is caused by prolonged incarceration); Human Rights Watch, Ill Equipped: U.S. Prisons and Offenders with Mental Illness, 53 (2003).

[25] See Christine Sarteschi, Mentally Ill Offenders Involved with the U.S. Criminal Justice System at 5 (July 16, 2013).

[26] Id.

[27] Id.

[28] Id. at 7.

[29] See Christopher Zoukis, Psychology Services in the Federal Bureau of Prisons, http://prisonlawblog.com (Aug 8, 2013).

[30] Christie Thompson & Taylor Elizabeth Eldridge, No One to Talk You Down': Inside federal prisons' dangerous failure to treat inmates with mental-health disorders, WASHINGTON POST, Nov. 21, 2018, available at https://www.washingtonpost.com/news/national/wp/2018/11/21/feature/federal-prisons-were-told-to-improve-inmates-access-to-mental-health-care-theyve-failed-miserably/?utm_term=.cdbabefcb5f3.

[31] Id.

"A review of court documents and inmates' medical records, along with interviews of former prison psychologists, revealed that although the Bureau of Prisons changed its rules, officials did not add the resources needed to implement them, creating an incentive for employees to downgrade inmates to lower care levels."[32]  Specifically, data shows that at the high-security penitentiary near Hazelton, "the number of inmates receiving regular mental-health care has dropped by 80 percent since May 2014."[33]  Research shows that treatment in the community is more effective in preventing recidivism than treatment in prison.[34]

C.







███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

**D.  The 3553(a) factors weigh in favor of a treatment-focused sentence.**

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  As the plain language indicates, this provision requires the Court to consider these purposes in relation to the instant offense.  The punitive effect of any sentence is not viewed in a vacuum by reference to an offense alone; rather, that effect is, and must be, measured against Mr. Pham himself.  As discussed at length, Mr. Pham suffers from severe mental health and related substance abuse conditions, which unquestionably led to his offense conduct and yet were never acknowledged, let alone treated before.  Punishment alone will not address those conditions and, in fact, will make them worse.  Individuals with mental illness are at serious risk of experiencing worsening psychiatric symptoms while incarcerated and have more difficulty adapting to prison when compared with the rest of the population.  Jamie Fellner, A Corrections Quandary:  Mental Illness and Prison Rules, 41 HARV. C.R.-C.L. L. REV. 391, 396 (2006).  While prison causes inmates "who have never suffered a significant psychiatric disturbance in the past [to] report worrisome psychiatric symptoms for the first time," experts acknowledge that prison is even more difficult for individuals with serious mental illnesses.  Terry Kupers, Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It 48 (1999).  For this reason, mental illness often predisposes prisoners to engage in the type of erratic or destructive behavior

that leads to solitary confinement, a punishment proven to trigger and exacerbate preexisting mental disease.  Human Rights Watch, Ill Equipped:  U.S. Prisons and Offenders with Mental Illness, supra, at 282-83.  Even if inmates with mental illness manage to adapt to prison life, however, they must still face the realities of a system ill-equipped to address their needs.

A sentence that incorporates Dr. Ortega's treatment plan is necessary to address the underlying causes of his criminal conduct:

> 1.   Treatment must be based on a comprehensive assessment of risks, protections, and needs.
>
> 2.   Forms of resistance must be uncovered including fear of the unknown, cognitive distortions, legal challenges, and so on, while enhancing the client's intrinsic motivation for positive and effective change.
>
> 3.   Objective interventions must be provided that are structured, goal-oriented, and relevant to the specific client and family. It must be trauma-informed and culturally based.
>
> 4.   Skills training must focus on strengthening appropriate behaviors utilizing multiple techniques and media for both in vitro (during sessions) and in vivo (at home or work).
>
> 5.   Positive reinforcements and strengths-based approaches are prioritized rather than punitive sanctions.
>
> 6.   Family, social network, and community-based resources are utilized for social support.
>
> 7.   Measurable feedback throughout treatment must be provided in meeting treatment expectations and for assessing progress.
>
> Mr. Pham's history indicates clear treatment needs however FAC does not offer an opinion on the specific type of evidence-based approach. Based on this assessment and other supportive documents, FAC advocates the following treatment goals specific to Mr. Pham:
>
> 1.   Mr. Pham should be expected to understand the need for treatment and seriously reflect on expectations for being a participant. He should be clear about what is expected of him especially in terms of establishing a trusting relationship that does not become interpreted as forced, submissive, or conforming, and that might otherwise engage him in his current internal and long-standing conflict.

2.   Mr. Pham should be expected to understand why treatment is essential and be able to explain his responsibility for his current situation, the harms his actions have imposed, and consequences if he fails to remain and fully participate in treatment.

3.   Mr. Pham must understand and differentiate his past victimization and trauma, within a trauma lens, that links his thoughts, feelings and actions in ways that allow him to see how his dysfunctional resolutions are based on cognitive distortions. He must become cognizant of the ways to promote more functional resolutions, and consistently demonstrate his ability to effectively regulate his thoughts, feelings, and actions for healthy, functional solutions.

4.   Mr. Pham must understand the role his alcohol dependence, sexual preoccupation, and multiple conflicts regarding internal, interpersonal, and socio-cultural challenges sustain his inability and poor motivation to change.

5.   Mr. Pham appears to be caught up in an internal crisis that reflects an established "chain of events" he engages in to resolve his conflicts. He has established a deeply rooted rationale for why he should continue his current path, which appears to undergird his continued investment in a cycle that manifests past dysfunctional behaviors. His memories, habituated responses (e.g., needing to drink; poor expression of anger) and associated beliefs, attitudes and opinions likely prevent him from choosing alternative and more appropriate responses.

A considerable focus in treatment must be on disrupting his usual response cycle.

6.   Mr. Pham must identify clear and unambiguous ways to prevent inappropriate behaviors as they are identified in treatment. He must understand the issue of "control" and appropriate self-expression - of emotions, behaviors, thoughts (including sexual thoughts) and physical outlets, and precipitating factors. He should identify those factors as ongoing challenges and seek resolutions that are appropriate, non-abusive and legal.

7.   Mr. Pham must identify, rehearse, and demonstrate steps toward personal responsibility for all his actions. He must consistently demonstrate personal responsibility in expressing his emotions, in close, interpersonal relationships, and in his work habits and involvement in all ways that are based on safe, healthy boundaries and that promote safe and healthy boundaries from others.

8.   It is essential for treatment with Mr. Pham to seriously consider engaging his social support network early on. Serious consideration should be given to marital and family treatment, and perhaps include members of his extended

family. Mr. Pham is embedded in his Vietnamese culture, and there are very
serious implications for the systemic harms imposed by Mr. Pham's traumas
(many of which appear shared by siblings) and by the impact his behaviors
have on his extensive social support network. Ortega Report at 28-29.

Specific deterrence will be best achieved through the implementation of the comprehensive

treatment plan as recommended by Dr. Ortega. In this case, incremental punishment will not

address adequately the concept of specific deterrence, because it will not address the constellation

of factors that led to this offense. Moreover, at his previous sentencing, neither the Court, the

Probation Office, the BOP, nor Mr. Pham himself, was aware of how serious and complex his

history of trauma was. Not a single issue was addressed that would give any Court the confidence

that Mr. Pham understood why he committed his crime or would avoid doing so again. Now, Mr.

Pham has opened up to a detailed assessment and is engaged in rigorous treatment. This Court has

the most comprehensive picture of Mr. Pham than anyone has ever had.

There is no evidence that a sentence incrementally proportionate to his last sentence is

necessary because the last sentence did not address Mr. Pham's history and characteristics and did

not address the underlying root causes of his behavior.  There is no reason to believe, therefore,

that a longer prison sentence will deter Mr. Pham.  Instead, the record demonstrates that for the

first time, this Court is in a position to address the constellation of factors that led to Mr. Pham's

behavior and ultimately his offense conduct.  In fact, a longer custodial sentence is likely to

increase his risk of committing future offenses, as it did in the past because imprisonment

aggravates mental illness rather than fixing it.  He has identified the root causes of his behavior –

trauma and addiction; he is taking steps to address them.

Addressing the underlying causes of Mr. Pham' criminal conduct is the most efficient way

to protect the public.  Implementing a comprehensive treatment plan will be the most effective

way to do so.  A prolonged period of incarceration will not protect the public in the future and is

likely to make Mr. Pham' underlying mental health issues worse. In fact, the public at large was not harmed by Mr. Pham. The guidelines in this case (largely driven by the loss amount) are not an adequate proxy for harm. The Fraud Guidelines, which are not based on empirical evidence, do not "reflect a thorough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 338.

The last statutory factor, the goal of rehabilitation, has been discussed at length.  Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  As a preliminary matter, Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).  Thus, imprisoning Mr. Pham for the term demanded by the Guidelines, cannot be justified on the basis of offering him any rehabilitation, education, or vocational training.  The Bureau of Prisons is unable to provide the comprehensive treatment plan that Mr. Pham needs and will undoubtedly make his PTSD, anxiety, and alcohol dependence worse.

Here, for the first time ever, the Court has a detailed and robust psychological evaluation and treatment recommendation in the form of Dr. Ortega's report and recommendation.  The Court should factor these recommendations into the sentence.

## V.   Conclusion

At fifty years old, Tony had never confronted decades of trauma, abuse, and mental illness. In 2010, Tony's sentencing judge did not know who Tony Pham was. Tony did not even know who he was. No one in his 2010 sentencing had an accurate history of Mr. Pham's past, an understanding of his trauma and resulting mental health issues, or an individualized plan that

could assure anyone that he was equipped to succeed in the future. Today, the exact opposite is true. For the first time ever, Tony Pham has talked about his life. It is the first time he's admitted what he has experienced to anyone, including his wife. Now having engaged rigorous psychiatric and substance abuse treatment, Tony is armed with an understanding and appreciation of his past, and a treatment plan that will help him cope with his future. A sentence that emphasizes a lengthy term of imprisonment will not best effectuate the purposes of sentencing. Rather, a sentence designed to address the constellation of factors that led to this offense, and a sentence that implements Dr. Ortega's treatment plan most appropriately satisfies the purposes of sentencing.

<div style="margin-left:40%">

Respectfully Submitted,

THE DEFENDANT,
Tony Tuan Pham

FEDERAL DEFENDER OFFICE

</div>

Date:   November 8, 2021            */s/ Ashley Meskill*___
                                    Assistant Federal Defender
                                    10 Columbus Blvd, Floor 6
                                    Hartford, CT 06106
                                    Phone: (860) 493-6260
                                    Bar No.: phv10217
                                    Email: ashley_meskill@fd.org

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 8, 2021 a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Ashley H. Meskill*___
Ashley H. Meskill