UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    CRIMINAL NO. 3:19-cr-14 (JAM)

     v.

TONY PHAM                                   November 15, 2021

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government submits this memorandum in connection with the upcoming sentencing of defendant Tony Pham, scheduled for November 22, 2021.   Pham is a recidivist fraudster who poses a continuing danger to society.   A substantial Guidelines term of imprisonment of 97 months represents a balanced consideration of the statutory sentencing factors.

## I.      OFFENSE CONDUCT

On December 4, 2019, the defendant pled guilty to two Indictment counts:   (1) Count One, charging conspiracy in violation of 18 U.S.C. § 371, with the objects of making false statements in violation of 18 U.S.C. § 1001 and committing wire fraud in violation of 18 U.S.C. § 1343; and (2) Count Nine, charging wire fraud in violation of 18 U.S.C. § 1343.   PSR ¶ 1.

Pham began this crime in September 2012—one month after leaving prison for his first federal fraud.   PSR ¶ 11.   For more than six years, until the end of January 2019, Pham was the "Managing Partner" of RDAP Law Consultants, LLC (the "Company"), in which capacity he orchestrated a conspiracy and scheme to defraud the Bureau of Prisons under the alias "Anh Nguyen."   *Id.*   The Company's employees, including co-defendants Constance Moerland and Samuel Copenhaver,[1] worked at Pham's direction and under his supervision.   *Id.*

Company employees contacted federal criminal defendants and inmates with offers to

---

[1] The Court principally sentenced Moerland to two years of probation and Copenhaver to 12 months in prison.

assist in gaining admission to the Residential Drug Abuse Program ("RDAP") administered by the Federal Bureau of Prisons ("BOP").   PSR ¶ 12.   By successfully completing RDAP, an inmate could qualify for up to 12 months' early release from custody.   *Id.*   Indeed, Pham advertised the Company as "The Sentence Reduction Experts."   *Id.*

In order to gain admission to RDAP, an inmate had to meet certain criteria, including having a diagnosable and verifiable drug or alcohol abuse disorder.   PSR ¶ 13.   Pham knew that many of the Company's clients did not have such disorders and were ineligible for RDAP.   *Id.* Because the Company was only paid if its clients were admitted into RDAP, Pham and his co-conspirators coached clients to feign or exaggerate the existence, duration, and extent of a substance abuse disorder to fraudulently trick BOP into admitting them into RDAP.   *Id.*

These fraudulent instructions fell into the following categories:

- When a client denied a history of alcohol abuse, Pham and his co-conspirators instructed clients to falsely inform BOP that the client:   (a) was a frequent or daily user of alcohol; (b) had tried unsuccessfully to quit drinking alcohol; (c) suffered from withdrawal symptoms if the client did not drink alcohol; and (d) had abused alcohol in ways that adversely affected the client's personal and professional life and, in particular, contributed to the client's conviction.   PSR ¶ 14.

- Pham and his co-conspirators directed clients to obtain one or more prescriptions for medications used to treat withdrawal symptoms, and to bring such medications when reporting to a BOP facility to serve their term of imprisonment, thus substantiating the appearance of a substance abuse disorder.   *Id.*

- Pham and his co-conspirators educated clients how to mimic withdrawal symptoms.   *Id.*

- Pham and his co-conspirators instructed clients not yet in custody to adopt a daily habit of drinking or to have a medical professional prescribe anti-anxiety medication.   *Id.*

- Pham and his co-conspirators also directed clients to consume alcohol immediately before reporting to a BOP facility to begin serving a term of imprisonment.   *Id.*

Pham, personally and through his co-conspirators, coached hundreds of clients to deceive and mislead BOP in this way.   PSR ¶ 15.   Co-conspirators, including Moerland and Copenhaver, told Government investigators that virtually every Company client was instructed how to deceive BOP.   Pham bragged to a client that it was immaterial that "300" of his other clients had no documented history of substance abuse.   PSR ¶ 53.   As a result of Pham's scheme, BOP wasted money and resources screening and providing treatment services to inmates who did not need them.   *Id.*   Further, RDAP participants engage in group counseling and meetings; thus, the presence of a participant (such as one of Pham's clients) who does not have an alcohol or substance abuse problem substantially reduced the value of peer-based group counseling for others who actually need help.   *Id.*

The Company charged clients a fee that typically averaged several thousand dollars.   PSR ¶ 16.   Often, a client had the option of paying a discounted upfront fee that would purportedly be refunded if the client were denied admission to RDAP, or that would be deposited into an escrow account to be released to the Company only if the client were to be admitted to RDAP.   *Id.*

To conceal the extent and success of his scheme, Pham transacted Company business using nominee accounts and affiliated corporate entities.   PSR ¶ 17.   Between September 2012 and January 2019, Pham maintained or had control of numerous bank accounts in his or his parents' names, as well as various shell companies, including Honest Startups and Community

Management Services, Inc.   *Id.*   For example, Honest Startups (a shell company started by Copenhaver) had a "payroll account" used to issue paychecks to Company employees, and Company clients were directed to make payments via accounts held by Honest Startups and Community Management Services.   *Id.*   Eventually, after experiencing problems with the banks they were using, Pham and his co-conspirators began to use PayPal to conceal client fees.   *Id.*

From September 2012 through January 2019, the Company earned approximately $2,628,137.92 in client fees through the defendant's scheme.   PSR ¶ 16.   The Government has calculated that Pham's personal profit was $1,342,405.57, an approximately 51% profit margin. Pham's profit was calculated by (i) adding the $400,807.00 in direct payments from clients to accounts controlled by Pham or his family members (ii) to the $1,204,171.21 in indirect payments to Pham filtered through his nominee and shell company accounts (*e.g.*, Honest Startups and Community Management Services), (iii) minus the $262,572.64 of potential business-related expenses paid by Pham.

Pham had the Company record employee telephone calls, enabling the Government to seize an enormous volume of recorded calls, as well as e-mails and other evidence.[2]   PSR ¶ 18.   This evidence showed Pham's numerous fraudulent acts to get otherwise ineligible prospective inmates into RDAP, examples of which are detailed below.

### A.   Cooperating Witness 1

On December 29, 2017, Pham and his employee Moerland spoke on the telephone with a cooperating witness ("CW-1").   PSR ¶ 19.

During the call, CW-1 denied any history of substance abuse.   PSR ¶ 20.   Moerland

---

[2] The Government is prepared to provide audio copies of the recordings transcribed below at the Court's request.

stated that "we absolutely can" still help CW-1 gain admission to RDAP, and, "What we would want to do because you don't have anything that's needed to get into the program right now, . . . what we would want to do is have you become a client immediately." *Id.*

Pham stated:    "Basically, the way we get you into this program is, there's a saying, it goes like this:   if you walk like a duck and you quack like a duck, what are they gonna say?   You remember?   You're a duck!   You're a duck!"   PSR ¶ 21.

Pham further stated:

> There are six things the BOP want you to say.   We're gonna make sure you say it correctly and honestly.   We practice your story. Then after that, we have a licensed substance abuse counselor work with you.   Now they're licensed, again, they're licensed.   They're not going to lie for you or for me.   But you are going to say all the correct things, you're gonna say all the right things, and when they're done, they're going to diagnose you and they're going to write a nice report. […] They know exactly what the report needs to look like. […] We're going to get you into this program correctly and legally.   PSR ¶ 22.

That same day, CW-1 entered into a consulting agreement with the Company at law enforcement's direction.   PSR ¶ 23.   Also that same day, Moerland emailed Pham about CW-1's interest in the Company's services.   PSR ¶ 24.   In the email, Moerland stated, in part, that CW-1's "[s]ubstance abuse history is sketchy.   Will need comprehensive documentation via our staff counselor."   *Id.*

On January 2, 2018, Pham sent an email to CW-1 requesting a copy of CW-1's PSR.   PSR ¶ 25.   CW-1 complied, and it indicated that CW-1 "may drink a beer once every five or six months," and that CW-1 "denied any abuse of alcohol in the past and asserted that [he/she] never consumes more than one beer on each occasion."   *Id.*   The PSR further stated that "[t]he defendant denied having any additional history of using controlled substances and reported . . . no history of substance abuse or treatment."   *Id.*   The next day, Pham emailed CW-1, "I have

- 5 -

reviewed your PSR and know exactly what we are up against.   We will be moving to the next

steps soon."   PSR ¶ 26.

On January 4, 2018, Pham and an uncharged Company employee ("UCC-1") spoke on the

telephone with CW-1.   PSR ¶ 27.   Pham instructed CW-1, in relevant part:

> There are six things the Bureau of Prisons wants you to say.   Six.
> [UCC-1] is going to send you an email on these six things. [...] Once
> you know these six things […] you need to practice your story.
> Practice your story. [...] The best stories are a true story that you
> might exaggerate a little.
>
> *       *       *
>
> Here are the six things.   Number one, you drink every day,
> including weekdays. [...]   Number two, alcohol is very important to
> you.   It's a big part of your life. [...]   Three, you're a good drinker
> now.   Your first glass of wine you don't feel anything. [...]
> Number four, you've tried to quit many times and you can't. [...]
> You get sick if you don't drink, you don't feel like yourself.   Ok?
> You can't sleep.   You can't think.   Like an alcoholic, like an
> addict.   You don't feel good unless you have a drink.   That's five.
> And number six, it's called abuse.   Abuse meaning bad things.
> Ok?   You do bad things when you drink. *Id.*

Later that day, at Pham's instruction, UCC-1 sent CW-1 an email with the subject line "6

things."   PSR ¶ 28.   In relevant part, the email stated:

> I want to first talk about the "secret to RDAP" which is that
> alcohol/drugs was a big reason why I got caught up in my case.
>
> Also, here are the 6 things that you want to know about yourself to
> say in the interviews and assessments.   We want to go over each of
> these in detail today when you have time.
>
> Frequent user (daily) - Story of your daily use
>
> Life revolves around alcohol - examples of stories here - such as
> inventory stocking up and daily personal and business activities
>
> Increased tolerance - stories you use more and more over the years
> to get the same effect
>
> Failure to quit - tried many times but unsuccessful - too hard
>
> Have withdrawal symptoms - can't sleep unless used alcohol,
> stressed out and agitated until using

Abuse in a) personal, b) business, c) criminal

a) personal - family mad that you use all the time, waste so much money, driving under influence

b) business - got to work late, left early to get to go use

c) criminal - alcohol contributed to me committing my crime since it clouded my judgment and I thought I can get away with it (liquid courage)[.]   *Id.*

Also on January 4, 2018, at Pham's instruction, UCC-1 sent CW-1 an email with the subject line "Doctor Visit."   PSR ¶ 29.   In relevant part, the email stated:

Please go to your doctor and tell him the following:

1) You have been drinking everyday for a very long time and are an alcoholic.

2) You will be going to prison and are scared that they are going to make you stop drinking cold-turkey.   Your attorney told you that you need to walk in there with some prescriptions or the prison will ignore your medical needs since it is so crowded in there.   Tell the doc you don't want to suffer.

3) Ask the doctor to please give you a prescription for "Librium" or "Ativan" or "Naltrexone" OR ANYTHING else he feels appropriate to help with the withdrawal.   Also ask for "Thiamine", which is a vitamin . . . .   Thiamine is the one that is very important to get.   They will not allow non-prescription pills into prison so buying it over the counter is useless (ie. it has to be a prescription).

Let me know when you get this.   Please fill it immediately.

You will be carrying and walking into prison with the bottle of pills...remember to bring them.   *Id.*

On January 8, 2018, Pham spoke on the telephone with CW-1.   PSR ¶ 30.   Pham and CW-1 made the following statements, in relevant part:

Pham:   If you walk in there and you say, you know what, I don't do any drugs.   I don't do, I don't use any prescription drugs, street drugs, and I don't drink at all.   They're gonna say, well, then there's no way you can get in this program. [...]   You can't be honest.   You can't be honest about it.   If you're honest about it, you're not getting in this program.

*     *     *

CW-1:  Like I said, I don't drink.   And from your experience, how much should I tell them that I drink?   Six beers a day?   Twelve beers?

Pham:   Yes.   It doesn't have to be a lot.   You could be, two, three, four beers a day.   But it's every day.   *Id.*

On January 9, 2018, Pham sent CW-1 an email with the subject line "Must Show Withdrawal Symptoms."   PSR ¶ 31.   Pham wrote:   "You need to show serious withdrawal symptoms as soon as you get to prison."   *Id.*   Pham also included links to two videos available on the Internet and instructed CW-1 to "watch these videos.   You will be doing this in some degree."   *Id.*   One of those videos shows a person going through withdrawal.   *Id.*

In a subsequent email that day, Pham stated, in part:

These are our talking points on the phone soon.   Please print this email out and take with you.

Please throw it away before walking into prison.

Please remember to bring the bottle and pills with you.

1)   What to Bring:   your prescriptions, some cash, your eyeglasses

2)   Drink 15 minutes before arriving and get prison doc to give you any meds for withdrawal using the 1-2-3 method (ask me to explain what that as).   Tell them "I abuse alcohol everyday.. My doc gave me these meds because he's afraid I may get a seizure and die or get brain damage.   I am really scared.   I need the meds.   Please help me!"

- Never say that you have anxiety or depression.   They will treat you for that and you will fail.   I lost two clients because of this.

- Take the medication that they give you !   Refusing would mean that you do not have a problem!

3)     When asked about symptoms, ALWAYS complain that you have them.   Never say I am doing better EVER even after several months!   They will use it against you that you are not really an alcoholic.

4)     Don't try to apply or ask too many questions for at least two weeks...remember you are suppose to be sick these two weeks.

- Start to go to Alcohol Anonymous and/or Narcotic Anonymous classes right away.

5)      Dealing with staff..they don't care about you.   Look and act stupid, like a loser, and don't ask too many smart questions.   Notice how these men are all stupid looking.   You want to be one of them. Act dumb and clueless about the RDAP program always.   Never challenge prison staff or they will get you and make it so hard! Always, "Yes Sir".

6)      Communications:   we will communicate through your family. NEVER EVER communicate about RDAP through email but instead only by phone or visitation.   If by phone, talk about RDAP near the end of the call.   All communication is through your one family member (wife?).     My new name is "ONLINE RESEARCH".   So, when referring to me, your family should say, based on my online research, you should do "X" next.   Do not talk about refunds or failures over the phone. . . .   There may be long periods of time where you have not heard directly from me...however we are always working and we are the ones that got you in.   PSR ¶ 32.

## B.      Cooperating Witness 2

On February 6, 2018, at Pham's instruction, another uncharged co-conspirator working at the Company ("UCC-2") sent an unsolicited email to another cooperating witness ("CW-2"). PSR ¶ 33.   CW-2 was a resident of New York who had been sentenced to 87 months of imprisonment following a federal felony conviction, but had not yet reported to a BOP facility. *Id.*   UCC-2 wrote to CW-2, in part:    "I'm trying to get in touch with you about an opportunity to reduce your federal prison sentence from 87 months down to 50-56 months."    *Id.*

The next day, at Pham's instruction, UCC-2 again emailed CW-2, claiming to have "additional information about how we will help you obtain an early release from prison via the RDAP program and Second Chance Act Petition.    With good time, looks like we can get you back home in as few as 50-56 months instead of 87 months.    With a 91% success rate, we guarantee our fee with a full refund."    PSR ¶ 34.    UCC-2 included "a few names and numbers of recent clients who will share their success achieved through our service.    Let them know that

our expert 'Anh' sent you."   *Id.*

After further correspondence, CW-2 met "Anh Nguyen" (Pham) in person at a hotel in Florida.   PSR ¶ 35.   CW-2 stated that he was "not a druggie" but may drink a beer "now and then."   *Id.*   CW-2 asked Pham, "Can they [RDAP] find out that you're not telling the truth?"   *Id.*   Pham responded, "No."   *Id.*   CW-2 asked, "But they're not going to investigate, ask people?"   *Id.*   Pham repeated, "No."   *Id.*   CW-2 asked, "So there's no chance of, quote unquote, getting caught and having a worse situation?"   *Id.*   Pham answered, "Zero.   Never ever.   Even if you did lie.   In fact, they expect you to lie.   Because everybody is lying [...] to try to get in this program.   In fact, if you don't try to get into this program, they'll look at you funny and go what's wrong with you.   Come on.   Say, say the words."   *Id.*

### C.     Cooperating Witness 3

On May 15, 2018, at Pham's instruction, Copenhaver sent an unsolicited email to a third cooperating witness ("CW-3"), a resident of Connecticut who had been convicted of federal felonies but not yet sentenced.   PSR ¶ 37.   Copenhaver explained that he was "trying to get in touch with you about an opportunity to explore early release programs offered in the BOP, should your case go that direction."   *Id.*

On July 27, 2018, at Pham's instruction, Copenhaver sent CW-3 another email (substantially similar to Moerland's October 2, 2017 email to CW-1), copying Pham.   PSR ¶ 38. In it, Copenhaver wrote, "Our clients receive an average 18 month reduction from the initial judge ordered sentence.   We take pride in our 91% success rate for clients accepted into the RDAP program, whereas the success rate for those who do not utilize our service is less than 10%."   *Id.* Attached to Copenhaver's email was a draft consulting agreement that outlined the Company's fee structure:   "Client will pay $6,500.00 into escrow account of client's choosing with funds released to Company only upon successful admissions into RDAP.   Alternatively, Client may

choose to pay Company upfront the discounted fee of $5,000." *Id.*

In a July 27, 2018 call, Copenhaver told CW-3 that the Company monitored federal court dockets nationwide to identify prospective clients.   PSR ¶ 39.   After CW-3 denied having a substance abuse disorder, Copenhaver stated:   "As long as you're able to follow instructions and you're a willing participant, everything will be A-OK."   *Id.*   Copenhaver introduced CW-3 to his "partner," "Anh Nguyen," who described the services provided by the Company.   *Id.*

On July 31, 2018, CW-3 again spoke on the telephone with Copenhaver, as follows:

> CW-3:  So, you know, my biggest concern, obviously, like I said, is that, I, you know, like, I don't drink, I don't do drugs, you know, I haven't.  I don't have a history of it.  You know, I'm really nervous, like I need your help to properly, you know, guide me through this so.

> Copenhaver:  I got it, I hear you.  As long as you know how to follow instructions.  Let Anh take the lead on this.  He is a good man.  He's a good guy, he's smart, he's got a good team working with him.  So, I mean, just let him take the lead on this and just follow instructions, and everything will be just fine.  PSR ¶ 40.

That same day, Copenhaver sent an email to Pham, copying CW-3.   PSR ¶ 41. Copenhaver wrote that CW-3 was "moving forward with our services" and noted:   "Substance abuse history is nonexistent.   Needs comprehensive documentation via our staff counselor."   *Id.* Pham replied to the email and requested that CW-3 provide a copy of their PSR.   *Id.*

On August 1, 2018, CW-3 spoke on the telephone with Pham, as follows:

> CW-3:  Hello?  Hello?

> Pham:  Hey, hi.  [CW-3], this is Anh Nguyen.  How are you today?

>                              *       *       *

> CW-3:  So, but anyway.  So alright.  I mean it looks we're gonna we're moving forward here.  One way or the other.

> Pham:  Yes we are.  Yes we are.  So I've been going through a little bit about your case.  I've pulled up your court dockets, you know, to see if there's any surprises there.   I know you sent me your

sentencing memo, it looks like.   Right?

CW-3:   Well I didn't send it, but I think that Sam [Copenhaver] pulled it off of Pacer.

*      *      *

Pham:   You're right. . . .   And my question is, then, what does it say in your substance abuse section of your PSR?   I wanna see what I'm working against.

CW-3:   Well umm…

Pham:   Do you remember?   You don't have to guess either, you know, I hate it when people guess.

CW-3:   You don't have to guess.   Sure, just like I explained to you guys on our first conference call, um you know, it says that, I don't have, you know, even though I've been on prescription medications here and there, you know, like I've B-S stuff, you know.   But I don't have a history.   So that's what it says.   That I don't have a history.

Pham:   Sure, sure.   You don't really have a problem at all.   Right.

CW-3:   You know, yeah.   But, you know, but I know that you and Sam said that there's ways to do things.   So, I don't know.

Pham:   There is.   You don't need to have it in your PSR.

CW-3:   Okay.

Pham:   Okay?   So, and here's why.   Later on, when you go inside prison, you're gonna apply to RDAP and this is what they're this is what the RDAP doctor's gonna say.   This is the decision maker, right?

CW-3:   Mhm.

Pham:   They're gonna say Mr. [CW-3], you know, in your PSR, it says you don't do anything wrong when it comes to substance abuse. And now you're sitting in front of me telling me you have a drinking problem.   Right?

CW-3:   Right.   Mhm.

Pham:   What's going on here?

CW-3:   Right.

Pham:   What's the truth?   And then your answer is, this is later on when you're in prison. . . .   Your answer is, you know what, during

that interview, doctor, I did not fully disclose all my substance problems because I wanted to look good in front of the judge.   My attorney told me – basically blame your attorney, [CW-3] – my attorney told me to be very careful in that interview.   Not to say anything bad.   Okay?   Mine did.

CW-3:   Mhm.   Mhm.

Pham:   I assume [your attorney] said, yeah, you got to be careful in that interview, didn't he?

CW-3:   I don't remember anything but –

Pham:   Yeah, my attorney doesn't want me –

CW-3:   Can I tell you something?

Pham:   Yes.

CW-3:   I just, you know, it's been so stressful.   I don't.   You know.

Pham:   I know.

CW-3:   Yeah, so.   But tell me, go ahead.   Continue.

Pham:   Yeah it's been stressful.   And you just say, you know, my attorney told me to be very careful in that interview, so I didn't fully disclose the nature of my substance abuse problem.   Okay?   So can I, you know that?   And that's a good answer.   Most people, I'm saying like ninety five percent of PSR's is inaccurate as to what reality really is.   Simply because you're being interviewed, and who in their right mind . . . would be sitting with a federal agent, that's what that probation officer is, right, that's a federal agent.

CW-3:   Mhm.   Sure.

Pham:   Who in their right mind would say, hey, just last night I was out partying with my buddies, or I was at the bar.   And had, you know, quite a few beers and then I jumped in the car and drove home.

CW-3:   Right.

Pham:   Nobody would say that.   To a federal agent?   They'd lock you up right there.   Right?

CW-3:   I don't know.   Yeah, I don't know.   I'm sorry.   Yeah.

Pham:   Yeah, so a lot of people hold back, [CW-3], and so, but let me ask you, are you, do you have any legal prescriptions now with your name on it?   Any legal prescriptions?

CW-3:   Just for my blood pressure, you know, nothing, you know, that's not.

Pham:   Okay.   You've got a script for BP.   Yeah, and that's it right?   Nothing else?

CW-3:   Yeah.   Nothing else.   Nothing else.

Pham:   Okay.   And how much are you drinking nowadays?   You can tell me.

CW-3:   I don't.

Pham:   You don't drink at all?   You just take your BP meds?   Okay.   I mean, are you against drinking?

CW-3:   No, not really.   I mean, not really.   I just, you know, honestly, I haven't had the money to do anything, you know.   But, you know, to go out.   And I don't really go out.   Who can go out and have a good time under these circumstances?

Pham:   Right.   And I want to let you know, the Bureau of Prisons is not looking for quantity.   They're not looking for you to go to some New York bar and drink like five beers, right?   They're like twelve dollars a beer.

CW-3:   Right.

Pham:   That's not what they're looking for.

CW-3:   Right.   Right.

Pham:   They're looking for frequency.   Someone who drinks mostly, you know, almost on a daily basis.

CW-3:   Okay.   So what should I do?

Pham:   You know, I would, you know.   You're a grown man. You have your own abilities, right?

CW-3:   Right.

Pham:   You can decide what you want to do.   And you may want to, you know you're being so – you just told me you're very stressed, right?

CW-3:   Right.

Pham:   A lot of people who are stressed, that likes to drink, which you do, they tend to drink now.   They may have just a glass of wine, nothing crazy.   I'm talking about a glass of wine a day.   Just to calm your nerves.

CW-3:   Right.

Pham:   I mean, have you drank wine before?   Is that your, what is your favorite drink kind of, do you think, [CW-3]?

CW-3:   I guess so.   Yeah, yeah.   Wine is okay.

Pham:   Yeah, why have a glass of wine.   I have a glass of wine every night.   It's actually good for your heart.   Right?   It helps calm your nerves.   It helps you sleep at night.   Less worried.   So it is very common for someone in your shoes right now to be drinking a glass of wine a night.   That way, later on, you don't have to say, you know, I drink most every day.   You're not lying.   Okay?

CW-3:   Right.

Pham:   Would you – can you do that?   You're a grown man, you can if you want to.   It's not illegal.

CW-3:   Okay.   So, um you want me to start drinking?   Is that?   I mean, I'm sorry, I'm just a little confused, you know.   So you're saying like I should have a glass of wine, you know, at night?   Or…

Pham:   [CW-3], I want you to do what's good for [you].   Okay?

CW-3:   Okay, right.

Pham:   So what is good for [you]?   It's not what I want that matters.   It's what you want that matters.   See what I'm saying?

CW-3:   No, I understand.   I understand.   But I'm thinking.   So, I'm sorry.   I didn't mean like to say what you want me to do, really, but, you know, what is it going to take?   Like, you know, what is it going to take for you know.   Obviously I need to, I don't know.   I need to figure out a way to qualify for this.   You know?   So, uh.

Pham:   Okay [CW-3].   I have no doubt that you're going to get in this program.

CW-3:   Okay.

Pham:   How's that?   I have no doubt.   Okay?   We know how to do it.

CW-3:   I'm just nervous Anh.   You know?   I'm just nervous.

Pham:   I know you're nervous.   And I'm saying, you're gonna get in for alcohol.   Wine counts as alcohol.

CW-3:   Mhm.

Pham:   And I would prefer, I don't know how much – I don't know you personally very well.   A lot of people tell me they're not drinking but they're really drinking a glass of wine or something, somewhere.   Right?

CW-3:   Right.

Pham:   And it's very unusual to see a man who may be going to prison to not be at least doing something.   At least taking some pills to calm their nerves, or having a glass of wine or two a night to help them with the stress.   You had just said me told me that you're stressed out.   It would be worth doing something to help calm your nerves.

CW-3:   Right.

Pham:   And it would be beneficial for RDAP if you drank now and then.   That's all.   And I think it'll help you.   So [CW-3], it would be – you get to decide, but it would be beneficial for you health-wise, stress-wise, and RDAP-wise, if you were drinking a glass of wine every night or two, and some of wine is very delicious.   I like wine coolers myself.

CW-3:   Right.

Pham:   It tastes like Sprite.   I like wine coolers.   Yeah just a wine cooler a night.   Okay?

CW-3:   Is that good enough, I mean.   Or is that good enough?

Pham:   Yes.   It's not it's not quantity [CW-3].   They're not looking for quantity.   They're – and you know, whether you drink one wine cooler or ten wine coolers a night, nobody knows.   You're sitting in your own house, who's going to know?   There's no recording.

CW-3:   Right.

Pham:   Right?

CW-3:   Right.

Pham:   All I'm saying is I would prefer you not have to say that you drink every day when you really don't.   So you can remedy that.   And it's good for your health.

CW-3:   Right.

Pham:   Right?

CW-3:   Okay.   Alright well, I understand.

Pham:   Does that make sense?   Would that work for you?

CW-3:   Yeah, yeah.   I guess so, yeah.   It makes sense.

Pham:   Okay.

CW-3:   You know I'm, listen, you know, like I said, you said you're gonna mold me, I'm listening, I'm gonna listen to you. Whatever you say, so.

Pham:   Right, so we're gonna, we're gonna start there.   And the second thing, and here's the thing, [CW-3], you're not gonna get sentenced for another four months.

CW-3:   Right.

Pham:   August, September, October, November.   And a lot of times, they move it.

CW-3:   Right.

Pham:   Right?   So they're not, there might not be much activity for the next two, three months.   There's a lot of time.   There's a lot of waiting.   It's not like we're it's not like we're working every day, you know, and there's four months of work.   Right?

CW-3:   Right.

Pham:   I'm just following your case for a while here.

CW-3:   Right.

Pham:   Okay?   So, I'm asking you [CW-3], maybe, um you know, during these four months, you know, just start to get a book on what drinking is all about.

CW-3:   Okay.

Pham:   You know, try to understand why you drink so you can communicate it.   What is the nature of it?   Just do a little research on it, you know.   Why do people drink?   What are some of their habits and what do they drink and it's gonna be wine.   You're you're a wine drinker.   Okay?

CW-3:   Right.

Pham:   Kind of do a little research on that.   And why don't you give me a couple of weeks, then, since we have so much time.   You do a little research; we do a little research.   Okay?

CW-3:   Mhm mhm.

Pham:   And then in those two weeks, I'm gonna have a follow up

call with you and we're gonna go over the six things the Bureau of Prisons wants you to say.

CW-3:   Okay.

Pham:   It's going to make sense to you, because you did a little research on what it is.   You know, it's not like phew, I have no idea what he's talking about, right?

CW-3:   Right, right, right yep.

Pham:   'Cause now you sort of understand what someone who drinks wine every day is all about.   And you're doing it yourself, and it tastes delicious, by the way.   I get stressed, I don't work – I work very hard all day and I get kind of tired, you know.   I get stressed.   I go home and I usually have a glass of wine.   And my significant other, she's drinking a glass of wine.   It's really good bonding time for us.

CW-3:   Sure, sure I understand.

Pham:   It's one of the things we do.   You know?   And it gets the juices flowing, and all that.   So it's a happy thing.

CW-3:   Okay.

Pham:   And I do it most every night.   Nothing wrong with that.   See that?

CW-3:   Right.   Right.

Pham:   And then, and then now you kind of know, and we'll go over the six things that they want to talk.   And we'll start your counseling after that, there's time.   But now you know how to talk about it.

CW-3:   Right.   So you're going to go over like the points with me? You said there's six points?

Pham:   Of course.   Of course.

CW-3:   Okay.

Pham:   So [CW-3] I don't want you to be nervous.   I think the wine will help you be less nervous.   And then I don't want you – we're gonna get you in.   We're gonna go slow.   'Cause we got four months.   Before you even get sentenced.   And even after you're sentenced, they give you another thirty to sixty days to report. We've got six months, man.

CW-3:   Right, right.

Pham:   Before you even walk into prison.   Okay?

CW-3:   Okay.   That's a lot of time.   That's a lot of time.

Pham:   That is a lot of time.

CW-3:   And then you said something about, you said, take some pills or something like that?   You know, you started saying something.

Pham:   What pills?   Well, pills are illegal to be taking.   I don't want you to do anything illegal.

CW-3:   Right, right.   No you said a few minutes ago, you said drink some wine, take some pills.   You said that's what people do. You know, or something like that.

Pham:   Well, I'm just saying, some people, when they get so nervous, they go to a doctor –

CW-3:   Oh okay.   Oh okay right.

Pham:   And they go, Doc, I am a nervous wreck.   Can you please give me a prescription for XYZ?   Right?   To help.   I'm a nervous wreck.   So it's very common to see people in your shoes legally; don't do anything illegal.   Don't be driving under the influence or doing any of that, because it's not going to help you, okay?

CW-3:   Right.

Pham:   I want you to do things legally.   It's legal for me to get a legal prescription.   So I notice, that a lot of our clients are taking Xanax, or something, Lorazepam, whatever.   And you're not doing that, that's why I asked you.   And then usually, they're drinking a glass of wine or so, and I think that would be helpful to you.   But please don't do anything you shouldn't, if you are.   Okay?

CW-3:   No, of course.   No, I don't want to get, listen.   I don't want to get in trouble with anything.   You know?   So.

Pham:   Yeah.   A glass of wine in your house, a wine cooler, and then we'll talk again.   There's six things, we're gonna talk about that.

CW-3:   Alright.   And you said the counselors, like, you know, that I'll be speaking.   Is that the lady in North Carolina that you mentioned or?

Pham:   Yes.   And after that you'll be able to interview with her. And we're gonna do some counseling.   She's gonna write a report. You need to say the right things.

CW-3:   Okay.   And you'll tell me what to do?   Obviously like what to say, how to like, you know.   You said you'll go over the points and everything so.

Pham:   I'll go over the points, but you have to reflect on your life as to how you fulfill those things.

CW-3:   I see.

Pham:   You've got to read between the lines of what I'm saying. You know what I'm saying?

CW-3:   Right.

Pham:   I'm not going to tell you to do anything.   So so you need to reflect and I don't know.   And I'll go over the secret to RDAP, you need to reflect on it.   If you're ready to say, you gotta be ready to say that you have a drinking problem.   If you're ready to do that, I'll help you tell your story of having a drinking problem.   And that because of your drinking, it clouded your judgement sometimes, you know?

CW-3:   Right right.

Pham:   It clouds your judgement because you had this drinking problem, and then you can tell your story.   And we'll document it, we'll apply for you, we'll submit it.   There's things that you need to do when you go to prison, and there's things that you shouldn't do.   And we'll go over that near when it's near time.   It's easy. PSR ¶ 42.

On August 7, 2018, CW-3 again spoke on the telephone with Pham:

Pham:   So, I know you're taking prescription drugs, I know you're against you're not against drinking, but you're not really drinking either.

CW-3:   No.   I – like I told you.

Pham:   No problem.

CW-3:   Yeah I've never.   Exactly, no problem.

Pham:   Yeah, it's no problem, you don't have to – but you are taking prescription drugs.

CW-3:   Well, only for my blood pressure, I mean, it's not –

Pham:   Blood pressure.   Okay.

CW-3:   They're not addictive drugs, they're not narcotics, you know, there's no muscle relaxers, there's no.

Pham:   Right.

CW-3:   You know, there's nothing that I think would qualify.

Pham:   So are you using street drugs?   Are you smoking something, or anything like that?   Taking any pills?

CW-3:   No.  No.

Pham:   Okay, so we are at a crossroad, and the crossroad, [CW-3], is that you have to be using alcohol or a drug before you can have a problem.   Right?

CW-3:   Okay.

Pham:   This is an alcohol – if you are clean as a whistle, you are basically chemical free.   Other than this blood pressure medication, which is not, doesn't count.   If you're chemical free when you walk into prison, and if that's what you tell them, you can't get in the program.   There's no way around it.

CW-3:   Right.

Pham:   You've got to use.   And it's not hard.   I've had guys get in for Benadryl they buy off the shelf.   You know, they have a hard time, they have allergies, they can't sleep unless they take some Benadryls.   I have guys that have been taking Benadryl for a long time.   I've had people get in for um other over the counter, you know, sleep meds that they buy over the counter.   That works too.   But it has to be some sort of chemical – chemical is alcohol as well.

CW-3:   Mhm.

Pham:   Obviously, chemical could be a lot of other types of prescription drugs.

CW-3:   Right.

Pham:   Chemicals could be street drugs, you know, they're smoking weed.   A lot of people smoke marijuana.   So and the reason, and let me tell you the secret to RDAP, and then you'll understand.   Now you have to tell me what you want to do, 'cause if you're chemical free, there's just no way to get you into this program.   We don't even want to try.   You already did your PSR, right?

CW-3:   Mhm.   Yes.

Pham:   Your PSR is done, I see it here.   So that's kind of set in stone in a way.   We can get you in.   I know we can get you in, [CW-3].   But you need to kind of help me figure out how to, you

know, get you lined up for that.   PSR ¶  43.

Later in the same call, Pham revealed to CW-3 what he purported was "the secret" to

gaining admission to RDAP:

> Pham:   And here comes the secret to RDAP.   Here's the secret:
> "You know what, Doc?   I blame alcohol as one of the main reasons
> why I'm in prison with you today.   If I wasn't drinking every day,
> I would be thinking more clearly and I would figure, what I was
> doing was a big – I'd be scared.   If I wasn't drinking, I would've
> been thinking more clearly, I would have been scared that what I
> was doing would put me in prison.   I wouldn't have done it."
>
> CW-3:   Right.
>
> Pham:   The secret is you've got to blame the drugs or you've got to
> blame the alcohol.
>
> CW-3:   I see, I see.
>
> Pham:   And you you – and it's, they want to know, the government
> wants to know were you drinking or were you – it doesn't have to
> heavily.   [CW-3], it's not about heavy drinking.
>
> CW-3:   Right.
>
> Pham:   It's about drinking maybe a beer, a couple of beers, or a
> glass of wine or two.   That's it.   You know, but you were doing it
> consistently.   Or or you're using prescription drugs consistently or
> you're using Benadryl off the shelf consistently.   Something
> consistently.   PSR ¶ 44.

Pham also repeatedly suggested that CW-3 lie about having a substance abuse problem:

> Pham:   I'd be ashamed – it would be a shame for you to not get in
> this program.
>
> CW-3: Okay.
>
> Pham: Okay?
>
> CW-3: So like, give it some thought, you know, it's just, please, you
> know.   Please help me. I'm trying to figure this out.   You know?
> So what do you, I mean like, as far as what, like –
>
> Pham:   Well you need, you need to tell me, [CW-3], that you used
> during the period of time, the one year period that's pretty much
> most of 2016, right?
>
> CW-3:   Right.

Pham:  From November 2015 to 2016 that you were using some sort of chemical.    That could be alcohol.    That could be prescription drugs.   That could be street drugs.   One of those three. 'Cause if you tell me that, then I can help you communicate. There's six things that can help you communicate, you know, your substance abuse.    What does the government, what does the program, what do counselors feel are looking for you to say?

CW-3:  Mhm.  Right.

Pham:  I can help you with that.   I can help you be able to communicate it.

CW-3:  Okay.

Pham:  Alright?

CW-3:  Alright. Alright.

Pham:  You've got to let me know, I mean, but if you if you are telling me that you don't use any chemicals and this program is not for you.

CW-3:  Right.

Pham:  See what I'm saying?

                              *        *        *

CW-3:  I don't want to lie to you.   You know?   And you know, you said something I mean, I don't know uh on our last couple of conversations.   You said something pertaining to, not pertaining to, but basically saying that, you know, even if I haven't drank until now, or haven't done anything maybe, you know um because of the stress of the case, and everything else um, maybe it could possibly bring that on.   I don't know, you know what I mean?   Um uh, so I mean, what do you suggest?   I mean, which way?   What do I do?

Pham:  Uh, I suggest you come out of your denial.   And so the the, um, [CW-3], nobody's asking you to be dishonest.   We don't want you to be dishonest.   Okay?   You're just going to have to read in between the lines.   We don't want you to be dishonest, but it is so rare, [CW-3].   It is nearly impossible to find a fullblooded American man -

CW-3:  Mhm.

Pham:  Who does not drink at all - ever.   That's what you're trying to tell me.

CW-3:  Right.   Mhm.

Pham:   Who does not use some sort of chemical of some kind.   I don't know of anybody.

CW-3:   Right.

Pham:   Growing up, I don't know a single person that is like you. And so the only thing I can - and if you talk to most anybody, they would be, their jaws would drop. like wow really?   Man, you are one different person.   Okay?

CW-3:   Right.

Pham:   So, all I'm saying is, it may be that you're just in denial and you may want to just rethink about your history or past.

\*      \*      \*

Pham:   You know, right, right, and I'm telling you.   In prison, everybody is saying what they need to say to get into this program. Everybody.

CW-3:   Right.

Pham:   Exactly, if you don't try?   If you don't try to get in, if you don't say what you need to say, the prison staff will think there's something wrong with you.   What, do you want to do your whole time in prison?   At least try.   Okay?

CW-3:   Right.

Pham:   Everybody's saying, and I know guys who say, yeah I've been smoking weed since I was five.   I know that's a lie, who smokes weed at five?

CW-3:   Right.

Pham:   But people, you'll blend in with everybody else trying to get in.   Except that you're going to be well prepped.   Okay? You're going to be well prepped, you're going to have the documentation, you'll be alright.   PSR ¶ 45.

Less than one hour after this telephone call, Pham emailed CW-3 with the subject line "6 things."   PSR ¶ 46.   The body of that email was substantively similar to the "6 things" email Pham had sent to CW-1 on January 4, 2018:

Please review and lets discuss on Thursday morning.

Below are the 6 things you want to be able to say based on your history.   At the interviews, make sure you don't say anything to go

against these six things by accident.

Remember the secret to this program was that we were using everyday even prior to your arrest on this case and it clouded your judgment and is a big reason why you have this case now.

These are the 6 things the substance abuse counselor and rdap doctor wants you to say for sure.   Never go against these six things while in the interview.   They will ask you stories about your life and drinks and pills, what you took, when, and why so be ready to tell your true life story with the substances.   We will discuss together before your interview.

1) Frequent user (daily) - Story of your daily use

2) Life revolves around alcohol/pills - examples of stories here - such as inventory stocking up and daily personal and business activities

3) Increased tolerance - stories you use more and more over the years to get the same effect

4) Failure to quit - tried many times but unsuccessful - too hard

5) Have withdrawal symptoms - can't sleep unless used alcohol/pills, stressed out and agitated until using

6) Abuse in a) personal, b) business, c) criminal

a) personal - family mad that you use all the time, waste so much money, driving under influence

b) business - got to work late, left early to get to go use

c) criminal - alcohol/pills contributed to me committing my crime since it clouded my judgment and I thought I can get away with it (liquid courage)[.]   *Id.*

**D.      Client 1**

Client 1 was a Company client who engaged in several telephone calls with Pham, Copenhaver, and another Company employee which were recorded by the Company's telephone system.   PSR ¶ 47.   Client 1 also e-mailed with Company employees, including Pham.   *Id.*

Pham and Client 1 had calls about Client 1's PSR, which depicted Client 1 as a social drinker.   PSR ¶ 48.   Pham discussed in detail the "six things" that Client 1 would need to convince BOP officials that she qualified for RDAP, similar to the emails described above.   *Id.*

Client 1 explicitly informed Pham that Client 1 did not abuse alcohol, to which Pham responded by instructing Client 1 to come out of "denial."   *Id.*   Pham sent an e-mail to Client 1 providing further detail about the "six things," and another instructing Client 1 to acquire prescriptions for medications used to treat alcohol withdrawal, such as Librium and Thiamine.   PSR ¶ 49.   When Client 1 expressed reservations about taking unneeded medications, Pham reassured her that she would only need to take the unnecessary medication for a few days in prison to help convince BOP officials that Client 1 had an alcohol abuse problem.   *Id.*

At Pham's direction, Client 1 detailed serious alcohol abuse in an assessment with a licensed counselor.   PSR ¶ 50.   Client 1 became upset and concerned because that counselor then classified Client 1 with a severe alcohol disorder.   *Id.*

During a January 19, 2018 call, Client 1 complained that she had been incorrectly diagnosed with a "severe alcohol disorder" after following "Anh's" instructions on how to deceive a BOP counselor or doctor, saying, "I did exactly what Anh told me, I told him [the counselor] the story Anh told me."   PSR ¶ 51.   Copenhaver reassured Client 1 that this was part of "falling in line, following the process and procedure," and that, "If you do not do this, you're gonna fail." *Id.*   When Client 1 stated that she did not actually have alcohol or drug withdrawals requiring the drugs "Anh" had instructed Client 1 to obtain, Copenhaver replied, "I know this….   I know that you're not a hardcore alcoholic.   For you to take advantage of these programs, you have to fall in line.   You have to know, you have to let us take the wheel here."   *Id.*   Later in the call, Copenhaver encouraged Client 1, "You need to be a willing participant.   You have to follow instructions and let us take the wheel here."   *Id.*

Also on January 19, Client 1 spoke to Pham and expressed concern that she "overdid it." PSR ¶ 52.   Pham responded that Client 1 needed to follow his instructions, saying he had done

this with over three hundred clients and that it was easy to show alcohol withdrawal symptoms to convince BOP officials that Client 1 had an alcohol problem.   *Id.*   Pham also said Client 1 need only practice a false, detailed story regarding her alcohol abuse.   *Id.*   Client 1 specifically asked Pham if the counselor had believed Client 1 about her supposed alcohol abuse, to which Pham responded, "Does it really matter?"   *Id.*   Client 1 objected that she had seen videos stating that RDAP required substance abuse to be noted in a PSR, which Client 1 did not have, and Pham responded:

> I don't really care.  I don't care.  Okay?  They're wrong. . . .  It wasn't in mine either.  Alright?  300 of our clients – [Client 1], all 300 clients that we have, none of them had it in their PSR.  If you had it in your PSR, [Client 1], I would tell you, "Don't hire us. You're good to go.  Adios.  Why waste money?  PSR ¶ 53.

Dissatisfied with the Company's services, Client 1 filed a complaint with PayPal for the return of his $3,000 fee.   PSR ¶ 54.   On January 20, 2018, Pham offered to return Client 1's money, plus an additional 10%.   *Id.*   Client 1 told Pham that she had informed the counselor that she had lied about having an alcohol abuse problem in the assessment, to which Pham responded that the counselor had quit working with the Company because of the situation.   *Id.*   Client 1 complained that Pham had advised her to "flat out lie," "make up stories," and "get drugs."   *Id.* Pham repeatedly apologized and said that he was ashamed.   *Id.*

### E.    Client 2

Client 2 was another Company client who, in a December 31, 2018 call, Pham instructed in great detail how to fool BOP employees and convince them that Client 2 was an alcoholic experiencing alcohol withdrawal.   PSR ¶¶ 55-56.   Specifically, Pham instructed Client 2, fifteen minutes before reporting to prison, to drink "a couple glasses of wine and take some of that wine and rub it on your neck, I want you to smell like alcohol," which Pham claimed would trick BOP medical staff because "their job is to prevent you from dying, and we are going to use that against

them." *Id.*   Further, Pham instructed Client 2 to tell his wife on telephone calls during his first two weeks in prison that Client 2 was experiencing alcohol withdrawal symptoms, since prison telephone calls are monitored by BOP staff.   *Id.*   Pham made clear that Client 2 would have to pretend "to go through withdrawal, you have to be sick" for two weeks, and that he should "remember the video," a reference to a video of an individual experiencing withdrawal symptoms that Pham sent to clients.   *Id.*

### F.   Diane Dalmy

Diane Dalmy was a federal defendant who was sentenced by the Court on May 15, 2018 and ordered to pay $2,000,000 in restitution.   PSR ¶ 57.   Dalmy never claimed in either her sentencing or resentencing memoranda that she had an alcohol or other substance abuse problem. PSR ¶ 58.   Yet week after her sentencing, Dalmy paid the Company $16,000.   PSR ¶ 57. During that same time period, Dalmy had call with Company employees.   PSR ¶ 59.

In a July 13, 2018 call, Dalmy told a witness she was "working with" an organization that was counseling her on how to qualify for RDAP.   PSR ¶ 60.   Dalmy stated that she had been advised, "You're going to have to go, you're going to have to act like you are going through withdrawals.   But you're going to have to be an actress."   *Id.*

Based on Dalmy's payment to the Company, her PSR, her recorded statements, and the pattern established by Pham's scheme, it is more probable than not that Company employees advised Dalmy how to fraudulently gain admission to RDAP.   PSR ¶ 61.

### G.   Stacey Pomrenke

Stacey Pomrenke was the Chief Financial Officer of a city utility in Bristol, Virginia, who engaged in a years-long course of corruption and was convicted after trial in 2016.   In August 2016, she was sentenced to 34 months' imprisonment.

In interviews with Probation, Pomrenke denied any history of substance abuse.   *United*

*States v. Pomrenke*, 1:20-cr-41-JPJ (W.D. Va.), Agreed Statement of Facts [Dkt. #7] at ¶¶ 2-31 (attached as Ex. 1).   Eight days after sentencing, Pomrenke and her husband were solicited by and began corresponding with Pham and his employees.   *Id.* at ¶ 7.   A few days later, Pomrenke entered into a $7,500 consulting agreement with the Company, which Pham signed under his "Anh Nguyen" alias.   *Id.* at ¶ 8.

Pham then began coaching Pomrenke and her husband regarding the steps to secure fraudulent admission to RDAP.   *Id.* at ¶ 9.   Pomrenke made clear that she only drank a glass or two of wine a week and did not have an alcohol abuse problem or addiction.   *Id.*   Nonetheless, Pham advised Pomrenke to complain to her physician of an alcohol problem and claim to be concerned about going "cold turkey" to obtain a prescription for a detox drug.   *Id.* at ¶ 10. Pomrenke followed Pham's instructions and received a prescription for Ativan.   *Id.* at ¶ 11.

On September 18, 2016, Pham sent Pomrenke an email with the subject, "Show Withdrawal Symptoms."   *Id.* at ¶ 12.   In the email, Pham detailed withdrawal symptoms Pomrenke should show within the first 24 hours of reporting to prison:

> You need to show serious withdrawal symptoms as soon as you get to prison.   Please watch these videos (showing the detox symptoms of alcohol and drugs).
>
> *        *        *
>
> Within 24 hours of going cold turkey, you will experience the following withdrawal symptoms:
>
> 1) A craving for alcohol
>
> 2) Dry mouth, headaches, extreme irritation/easily annoyed
>
> 3) Can not sleep, extreme anxiety
>
> 4) Sweaty
>
> 5) Shakes
>
> 6) Nausea
>
> Within 12 hours of going cold turkey, you will experience the

> following withdrawal symptoms.   You must show these symptoms
> for 2 weeks so when asked during that time you must say "Yes, I
> have these symptoms". If you say "No, I am fine." or "I feel better."
> or "I am ok now", that means you are not an alcoholic and they may
> deny you later (or give you a really hard time to get in).   *Id.*

On September 23, 2016, Anh Nguyen sent an email to Pomrenke with the subject, "Prison

Preparation To-Do's," stating:

> These are our talking points…1) What to Bring: your prescriptions
> for withdrawal, some cash, your eyeglasses and wedding ring (if
> any)…2) Drink 15 minutes before arriving and get prison doc to
> give you any meds for withdrawal using the 1-2-3 method (ask me
> to explain what that is).   Tell them "I am an alcoholic and I drink
> everyday.   My doc gave me these meds because he's afraid I may
> get a seizure and die or get brain damage.   I am really scared.
> Please help me!" - NEVER ask for medicine since they will never
> give it to you.   Rather, ask for help and they will give you medicine!
> *Id.* at ¶ 13.

Pham continued to work with Pomrenke, including a call on the night before she reported

to prison.   PSR ¶ 14.   The next day, when Pomrenke reported to a BOP facility, she was

intoxicated, as Pham had advised.   *Id.* at ¶ 15.   During her initial BOP health screen, Pomrenke

followed Pham's instructions and falsely reported that she "had been drinking at least a bottle of

wine daily since 2008.   Last drink approximately two hours ago."   *Id.* at ¶ 16.

Pomrenke was screened to determine her eligibility for RDAP, and BOP staff reported:

> Per her PSI, she reported being a "social drinker of alcohol since age
> 23.   She denied the use of or experimentation with any illegal
> substances."

> Inmate Pomrenke was originally determined to be unqualified for
> the RDAP due to insufficient documentation in the PSI regarding
> her substance use.   However, upon entering the Bureau of Prisons,
> she reported drinking alcohol daily.   She was placed on the detox
> regimen by Health Services staff and diagnosed with Alcohol use,
> with alcohol-induced disorder.   *Id.* at ¶ 23.

Three days later, Pomrenke made numerous false statements to a BOP physician:

> She reported daily use of alcohol in the year prior to her arrest for
> the instant offense.   This is consistent with information in her

> Health Services Intake as well as medical records from her family
> doctor. She acknowledged using for longer periods of time than
> intended, having a persistent desire or unsuccessful effort to reduce
> her use, experiencing cravings, failure to fulfill major role
> obligations because of substance use, continued use despite
> awareness of interpersonal or social problems, giving up activities
> for the substance, using in hazardous situations, continued use
> despite awareness of physical or psychological problems that is
> likely to have been caused or worsened by the substance, markedly
> increased the amount or markedly diminished effects, and
> experiencing withdrawal symptoms. *Id.* at ¶¶ 24-25.

As a result of Pham's coaching, Pomrenke was admitted to RDAP. *Id.* at ¶ 26. Pomrenke's husband was so pleased with Pham that he agreed to discuss the experience with "a high profile potential client" of Pham's. *Id.* at ¶¶ 27-28. Because of her fraudulent participation in RDAP, Pomrenke's term of imprisonment was reduced by seven months and a day. *Id.* at ¶ 29.

## II.   DISCUSSION

The § 3553(a) factors demonstrate that Pham deserves a 97-month term in prison.

### A.   The Sentencing Guidelines

A 97-month sentence falls near the low end of the advisory Guideline range for Pham.

In calculating the applicable Guidelines, the PSR and parties agree that Pham's total offense level is 26. Plea Agreement [Dkt. #80] at 6. *Accord* PSR ¶¶ 66-77. This includes enhancements for more than $1.5 million of gain (because loss reasonably cannot be determined) under U.S.S.G. § 2B1.1(b)(1)(I), for sophisticated means under § 2B1.1(b)(10)(C), and for Pham's role as an organizer or leader of a conspiracy involving more than four participants under § 3B1.1(a), as well as a reduction for Pham's timely acceptance of responsibility under § 3E1.1. Plea Agreement at 5-6. The parties "initial assessment" was that Pham fell within Criminal History Category III, but they reserved the right "to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate." *Id.* at 6. As Probation has now correctly calculated it, Pham's Criminal History Category is actually

IV, which includes three points for Pham's prior federal fraud conviction under U.S.S.G. § 4A1.1(a), one point for each of his two drunk driving convictions under § 4A1.1(c), and two points for Pham's commission of the instant offense while on supervised release (and state probation) under § 4A1.1(d).   PSR ¶¶ 81-87.   The Court should use the correct Criminal History Category of IV, resulting in a Guidelines range of 92-115 months.

Pham now argues that the Guidelines overstate the harm caused by his fraud, principally due to the large "loss" enhancement.   Def's Sent. Mem. [Dkt. #175] at 40.   But Pham directed and ran the entire scheme, which earned $2,452,266.43 in fees from clients instructed to lie to BOP.   Even if the Court were to substitute Pham's personal gain for the parties' stipulated "loss" figure, his Guidelines range would still be 77-96 months.

The Government's suggestion of a 97-month sentence is near the low end of the properly calculated Guidelines range and at the high end of the Guidelines range erroneously calculated by the parties, and thus represents a balanced sentence that was within Pham's contemplation when he entered into his plea.

### B.    Nature and Circumstances of the Offense, Seriousness of the Offense, Just Punishment, and Adequate Deterrence

The nature and circumstances of this offense are serious, and just punishment, respect for the law, and the need to send a deterrent message call for a very significant term of imprisonment, consistent with the Government's suggestion of 97 months.

Pham was the driving force behind a more than six-year, routinized conspiracy to defraud BOP.   Pham was the most culpable participant in this scheme: he supervised the conspirators and personally coached Company clients to fake addictions and lie their way into RDAP.   Moreover, the seemingly legitimate business and multiple employees that Pham supervised allowed him to perpetrate this crime more efficiently.   Aware of the need to cover his tracks, Pham even used an

alias, as well as a sophisticated web of shell companies and nominee bank accounts to obscure the revenues and profits of the scheme.    Based on Pham's past experience with a fraudulent business, it should come as no surprise that this scheme was competently executed.

Although impossible to quantify, Pham's criminal conduct had a real negative impact on the criminal justice system, BOP, and the community of federal inmates he claimed to be helping. By enabling clients to fraudulently gain admission to RDAP, Pham's scheme shaved unjustified time off sentences imposed by federal judges.    For each of those defendants, Pham's scheme devalued the effort and resources expended by the federal bench, the Probation Office, and the Government during the individualized sentencing process.    Moreover, Pham's scheme squandered BOP resources and hurt federal prisoners, insofar as clients without substance abuse disorders who successfully lied their way into RDAP deprived or delayed addicted prisoners from receiving treatment, or made group therapy less impactful by virtue of their participation.    Pham acted without regard to the collateral damage he was inflicting.

In addition, the Court should also consider the devastating impact Pham had on the lives of his less culpable co-conspirators, Moerland and Copenhaver.    Were it not for Pham, it is unlikely that either would have engaged in a federal fraud, much less one of this scope and harmfulness.    Copenhaver wrote a letter to the Court seeking leniency for Pham before his prior federal sentencing.    *United States v. Tony T. Pham*, 08-03019-05-CR (W.D. Mo.), Pham's Supp. Mem. in Aid of Sent. [Dkt. #185] at 4 (enclosing letters, attached as Ex. 2).    Copenhaver, who knew Pham from working as the general manager of his pizza restaurant, called him "an honest and honorable man."    *Id.*    Three years later, Copenhaver began working for Pham at the Company, and was drawn into a crime that left Copenhaver penniless and in prison.

Pham's influence on Moerland was even worse, even as he now makes an inapt attempt to

- 33 -

compare himself to her.   Def's Sent. Mem. at 35-36.   Moerland was by far the least culpable defendant in this case.   Aug. 21, 2019 Moerland Sent. Tr. [Dkt. #65] at 31 ("You're far and away the least involved of those who have been charged in the case here.   It was quite time limited, quite money limited I think for you.").   She worked at the Company in sales for one year, during which time she took direction from Pham and Copenhaver.   Pham paid Moerland $11 an hour plus a 5% commission; in one year, Moerland received only $22,000.   *Id.* at 19.   Upon her arrest, Moerland promptly accepted responsibility for her conduct, pled guilty, and proffered to the Government.   *Id.* at 32.   Moreover, Moerland's personal circumstances were different from Pham's, in that she was a high school dropout, with no serious criminal history, who worked at the Company out of economic desperation.   *Id.* at 31-32.

The cynical nature of Pham's crime, its longevity, its complexity, the number of participants, and the direct and indirect harms it caused call for very significant punishment.   A 97-month sentence would be just, would reflect the seriousness of Pham's offense, and would send a persuasive deterrent message.

### C.   Defendant's History and Characteristics, Respect for the Law, and Protection of the Public

On balance, Pham's personal history and characteristics show that he lacks respect for the law, making a very significant term of incarceration necessary to protect the public.

### 1.   Pham's recurrent criminal conduct

This was not Pham's first federal fraud conviction.   Pham is a professional and serial fraudster, who has twice pled guilty to multi-year fraud schemes.   During the period from April 2004 to January 2019, Pham was engaged in fraud nearly 70% of the time, or in 122 out of those 177 months.   All told, Pham's frauds have earned more than $13 million.

Pham perpetrated his first fraud in connection with his dietary supplement business,

Techmedica Health, Inc., which he owned and operated.   PSR ¶ 81.   In 2009, Pham was indicted on dozens of counts in the Western District of Missouri.   *Id.*   In his 2010 plea—to counts of conspiracy to defraud the United States and conspiracy to commit money laundering—Pham admitted that from 2004 to 2009 he used Techmedica to repackage, sell, market, and distribute various dietary supplements which he falsely claimed had been proven in clinical trials to cure, mitigate, treat or prevent certain diseases.   *Id.*   Pham and his co-defendants derived $11,954,648.60 from the scheme, which he forfeited as part of his plea.   *Id.*

Pham now portrays himself as having been duped by his co-defendant in that crime, Charles Thao, arguing this "exhibits the power of a Svengali-like figure over a young, ambitious and gullible man."   Def's Sent. Mem. at 20-21.   But Pham misrepresents the facts that he admitted in 2009: he lied to the Food and Drug Administration about the unapproved and misbranded drugs he was selling; he renamed drugs that he had committed to cease producing and shipping; he fabricated a non-existent nurse to tout the effectiveness of his wares; and he operated "mirror image" websites designed to hide from the FDA the false testimonials, product information, and identification of medical professionals he used to sell those drugs.   *United States v. Tony T. Pham*, 08-03019-05-CR (W.D. Mo.), Presentence Investigation Report [undocketed] ¶¶ 38-40 (citing "Factual Basis for Guilty Plea" section of Pham's 2009 plea agreement) (hereinafter "2009 PSR," attached as Ex. 3).   Ignoring these essential facts, Pham instead cites to his own attorney's pre-sentence summary to Probation, while omitting the portion in which his counsel admitted that he acted "with the clear purpose and aim of defrauding the FDA."   2009 PSR ¶ 96.   Given Pham's unsuccessful attempt to minimize his prior fraud, it is doubtful that he sincerely accepted responsibility for that conduct.

The district court recognized Pham's meaningful criminal conduct and sentenced him to

36 months of imprisonment.   *Id.*   During his time in BOP custody, which began in December 2010, Pham applied and was admitted to RDAP.   *Id.*   In August 2012—after serving only 21 months—Pham was released to a residential reentry center.   *Id.*   The next month, he began committing his RDAP scheme.   After another two months, Pham was released to three-months of home confinement.   *Id.*   He began his term of supervised release in February 2013, and requested early termination in September 2014, falsely representing to the Court, "My conduct was perfect while incarcerated and while on Supervised Release these past 18 months."   *United States v. Tony T. Pham*, 08-03019-05-CR (W.D. Mo.), Request for Early Termination of Supervised Release (Pro Se) [Dkt. #222] (attached as Ex. 4)*.*

Together, Pham schemes have hurt thousands of people.   In his first, Pham sold worthless drugs to tens of thousands of people based on false claims that they could provide relief for their (in some cases, fatal) diseases.   2009 PSR at ¶ 94.   In his RDAP scheme, Pham helped hundreds of clients deceive BOP, wasting government resources and depriving prisoners of the chance to participate in life-changing treatment.

Pham began engaging in his RDAP scheme before he was even done serving his sentence for his diet pill fraud.   By his own account, the idea behind RDAP Law Consultants was hatched while he was in prison, and put into motion almost as soon as Pham left custody.   Def's Sent. Mem. at 22-23.   Pham embarked on this new fraud the month after he was released from FCI Morgantown, while living in a residential reentry center.   PSR ¶ 159.   In other words, Pham was committing federal crimes for two of the three months he was in a hallway house, for all three months of his home confinement, and during all 20 months of his supervised release.

Though not of the same significance, in 2016 Pham was twice arrested and convicted of drunk driving.   The second offense earned him 18 months of probation, the entirety of Pham spent

continuing his RDAP scheme.

Even since his arrest in January 2019, Pham has repeatedly failed to comply with the Court's conditions of release.   Although Pham's March 2020 arrest for driving with a suspended license and September 2021 violations of his location monitoring condition were plainly improper, they pale in comparison to his attempt to obtain false identification.   On December 10, 2020, Customs and Border Patrol's Fraudulent Document Analysis Unit seized a package from China containing a pair of counterfeit Michigan driver's licenses picturing Pham, but bearing a false name, address, date of birth, and date of issue.   *See* Fraudulent Document Analysis Unit Report (attached as Ex. 5).   Pham admitted that he had ordered these documents, but claimed they were novelty items meant to deflect his co-worker's attention; importantly, Pham did not claim at the time that he had been harassed or felt himself to be in danger.   The most plausible explanation for these false identification documents is that they were a part of Pham's plan to flee.   Pham's inability to abide by the conditions of his release—for a short period of time, large or small, while being supervised by Probation, knowing that the Court would consider his conduct at sentencing— shows his unwillingness to change his ways.

Just as with his 2009 fraud, Pham attempts to minimize his own culpability for his RDAP scheme, implying either that he was under his partner Monte Warren's sway until 2017, or that the Company only began engaging in fraud after Warren's 2017 death.   Def's Sent. Mem. at 22-23. This seems inconsistent with Pham's own account of events, in which he bought the RDAP Law Consultants "business and most of the profits" from Warren in 2016.   *Id.* at 23.   Of greater concern, Pham also states that, "[a]t first, Tony and his associates did not encourage inmates to exaggerate their substance abuse issues or to lie to get into RDAP."   *Id.*   This is contrary to the parties' factual stipulation, in which Pham agreed that he began perpetrating this fraud during the

three-month period in 2012 when he resided in a halfway house.   Plea Agreement at 11.   Either

Pham is now alleging (in a misleading way) that the Company's operations were legitimate for a

bare handful of weeks, or he has lied to the Court.   So that the Government can decide whether

to exercise its breach rights under the plea agreement, Pham should correct this ambiguity.

### 2.    Pham's abuse allegations

Pham has now alleged that he was the victim of physical, emotional, and sexual abuse as a

child.   PSR ¶ 94; Def's Sent. Mem. at 5-14.   As with every other facet of the defendant's life

and conduct, the Court should take this claim into account in reaching its sentencing decision.

When presented with a defendant's claim of previously unreported childhood sexual abuse,

the Government is confronted with a peculiar challenge.   The claim can neither be proven, nor

rebutted.   A natural inclination towards sympathy runs into an equally natural inclination towards

skepticism.   Under these circumstances, there is particular reason to regard Pham's claim with

suspicion.   In 2009, Pham denied to Probation that he had been the victim of childhood abuse.

PSR ¶ 97 ("Of note, Mr. Pham's prior federal PSR does not reflect the physical, sexual and verbal

abuse he endured during his childhood."); 2009 PSR ¶ 119 ("He described a closely knit family,

and that despite his father's 'mild alcoholism, which had no impact on the family,' they were well

treated and were loved.").   Moreover, as the PSR makes clear, Pham is the only source of

information about his own abuse.   PSR ¶ 94 ("According to Pham…"); *id.* at ¶ 148 ("[Pham]

further reported…"); *id.* at ¶ 160 ("Mr. Pham reported…").   *See also* Def's Sent. Mem., Ex. R at

3 ("Mr. Pham said that while in discussion with his defense attorney, Ms. Barrett, he disclosed

multiple traumas including that he was sexually abused….").   Pham has provided no

corroboration for his claim, and even his siblings do not purport to have any supportive recollection

(although they also do not contradict him. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████).   Def's Sent. Mem., Ex. R at 4 ("David Pham

[(Tony Pham's brother)] indicated he had no memory of Mr. Pham's sexual abuse...."), Ex. A at

7 ("It also came to light recently that my uncle may have sexually abused him."), Ex. D. at 6-8

("[M]y uncle may have molested Tony....").   Indeed, Pham apparently first made this allegation

this summer, more than 18 months after his guilty plea and after repeatedly moving to continue

his sentencing.   *See* Def's Sent. Mem., Ex. R at 25; Dkt. #88, 93, 99, 113, 123, 151 & 164.

While there may be a variety of possible reasons for this delay, *see* Def's Sent. Mem. at 18, one

explanation is that Pham fabricated his sexual abuse claim for purposes of this sentencing.   The

Court should also note the extent to which Pham's sexual abuse claim parallels the substance abuse

claims by clients that were key to his RDAP scam; although hundreds of Pham's clients had no

documented addiction history, a difficult-to-disprove claim allowed them to gain admission to

RDAP.   2009 PSR ¶ 124; PSR ¶ 53 ("[A]ll 300 clients that we have, none of them had it in their

PSR.").[3]   The Court should proceed cautiously when, on the eve of sentencing, a recidivist

fraudster who has recently demonstrated disregard for the Court's rulings makes an uncorroborated

and unverifiable abuse allegation similar to as the central misrepresentation from his own fraud

scheme.

If true, Pham's childhood abuse still provides only weak mitigation for his well-

documented history as a recidivist fraudster.   Nothing in Pham's past—including the events

giving rise to his PTSD, general anxiety disorder, and alcohol abuse—justifies his repeated

victimization of others for his own pecuniary gain.   Indeed, the complexity of Pham's scheme

---

[3] The Government notes that this same pattern from Pham's own 2009 fraud case, where Pham
initially claimed to only drink "one to two beers every couple of days," but by sentencing claimed
to "consuming two to eight cans of beer daily."   2009 PSR ¶ 124.   Trouble is, Pham's wife
contradicted him, stating in her pre-sentence interview that "she observed him to consume one to
two beers after work."   *Id.*

and his ability to orchestrate it for more than six years call into question the extent to which he was affected by these disfunctions.    While Pham may have been inspired to commit fraud by his feelings of inadequacy, his need for familial approval, or cultural pressure to succeed, there is a motive behind nearly every crime and a psychology behind every criminal.    Even after his first term of incarceration, Pham still had a University of Michigan computer engineering degree and options.    Some deep personality flaw may have led Pham immediately to dive back into fraud within weeks of his release from prison, but it is not one that favors leniency.    Indeed, any leniency afforded Pham in his earlier sentencing appears only to have emboldened his inclination towards criminality.

### D.    Restitution

Pham's crimes are mandatory restitution offenses and the Plea Agreement contemplates the possibility of restitution.    However, the victim is a federal agency and the parties have stipulated that the pecuniary loss suffered by BOP cannot be reasonably calculated.    Therefore, the Court should "find, from facts on the record, that…complex issues of fact related to…the amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process," 18 U.S.C. § 3663A(c)(3)(B), and decline to impose an order of restitution.

*       *       *

For the above reasons, a Guidelines sentence of 97-months imprisonment would be sufficient, but not greater than necessary, to meet the goals of sentencing under § 3553(a).

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY


_____ /s/ _____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT    06510
Tel.: (203) 821-3700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2021 a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.   Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
